5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 0 4 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | C.R. NO. B-98-466 |
| | § | |
| JOHN EDWARD MORTIMER, | § | |
| Petitioner. | § | |
| (C.A. NO. B-00-171) | § | |

RESPONSE TO MOTION FOR RELIEF
UNDER 28 U.S.C. § 2255

TO THE HONORABLE JUDGE OF SAID COURT:

The UNITED STATES OF AMERICA ("the government") files this
response to John Edward Mortimer's ("Mortimer's") Motion For Relief
Under 28 U.S.C. § 2255. In support thereof, the government would
show the court the following:

I.

JURISDICTION

Mortimer seeks relief from the judgment of conviction and
sentence entered by this court on March 1, 1999 (DOC 54). Mortimer
was indicted on September 1, 1998 (DOC 1) and charged with
conspiracy to possess with intent to distribute more than 100
kilograms of marijuana and possession with intent to distribute
more than 100 kilograms of marijuana in violation of 21 U.S.C. §
846 and 841(a)(1). On Mortimer's plea of not guilty, the case
proceeded to trial before a jury beginning November 9, 1998 (DOC
22). The evidence closed on November 20, 1998 (DOC 35). On
November 23, 1998, after due deliberation, the jury returned its

verdict: Mortimer was found guilty of the offenses alleged in the indictment (DOC 41-43). Mortimer perfected an appeal to the United States Court of Appeals for the Fifth Circuit (DOC 53), Case No. 99-40257. The court of appeals affirmed the judgment of conviction in an unpublished opinion issued on January 4, 2000 (DOC 62). Mortimer timely filed the instant motion for relief under 28 U.S.C. § 2255 on October 30, 2000 (DOC 66). Jurisdiction is thus vested in this court under 28 U.S.C. § 2255.

The facts underlying the judgment of conviction to the extent they are germane to the issues presented herein are set forth n full in the government's brief to the Fifth Circuit. A copy of that brief is attached hereto as Appendix A.

II

GROUNDS FOR RELIEF/ISSUES PRESENTED

In his motion for relief under § 2255, Mortimer raises three issues:

A. Whether the evidence used to secure his conviction was seized consequent to an unlawful search;

B. Whether the evidence used to secure his conviction was seized consequent to an unlawful seizure; and

C. Whether Mortimer was denied his right to the effective assistance of counsel at trial when his counsel failed to renew his motion for a judgment

2

of acquittal after presenting evidence in Mortimer's behalf.

## III.

ARGUMENT: AUTHORITIES FOR DISMISSAL

A.  Propriety of the search

Mortimer's challenges to the admissibility of the contraband seized at the checkpoint is presented for the first time in the instant proceeding. It is beyond cavil that "a claim of unconstitutional search and seizure is cognizable in a § 2255 proceeding." *Kaufman v. United States*, 394 U.S. 217, 231, 89 S.Ct. 1068, 1076 (1969). To succeed on this claim, however, Mortimer must overcome some significant hurdles.

Motions to suppress evidence must be raised prior to trial. FED. R. CRIM. P. 12(b)(3). Failure to raise such a claim pre-trial will constitute a waiver of that issue. FED. R. CRIM. P. 12(f); *United States v. Chavez-Valencia*, 116 F.3d 127, 129 (5th Cir. 1997). Having thus waived any challenge to the legality of the seizure of the marijuana used to secure his conviction, Mortimer must show cause and prejudice before he is entitled to collateral relief. The question of whether a procedural default bars a defendant from securing collateral relief, was decided by the *en banc* United States Court of Appeals for the Fifth Circuit in *United States v. Shaid*, 937 F.2d 228 (5th Cir. 1991)(*en banc*).

3

In *Shaid*, the Court addressed the issue of whether a defendant can obtain section 2255 relief without demonstrating cause for failure to raise an error at trial or on direct appeal. *Shaid*, 937 F.2d at 229. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice', *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), or that he is 'actually innocent', *Murray*, 477 U.S. at 496; *Smith v. Murray*, 477 U.S. 527, 537 (1986)." *Bousley v. United States*, _ U.S. _, 118 S.Ct. 1604, 1611 (1998). *United States v. Torres*, _ F.3d _, 1999WL251, at * 2 (5th Cir. Jan. 7, 1999).

The *Shaid* Court observed that a collateral challenge cannot do service for an appeal. *Id.* at 231 (*citing United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593 (1982)). After conviction and exhaustion or waiver of any right to appeal the Court is entitled to presume that the defendant stands fairly and finally convicted. *Id*, at 232 (*quoting United States v. Frady*, 456 U.S. at 164, 102 S.Ct. at 1592). A defendant can challenge his conviction after it is presumed final only on issues of jurisdictional or constitutional magnitude. *Shaid*, at 232 (*citing Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471 (1962)). An issue cannot be raised for the first time on collateral review without showing both "cause" for his procedural default, and "actual

4

prejudice" resulting from the error. *Shaid*, at 232 (*citing Frady*, 456 at 168, 102 S.Ct. at 1594). If the error is not of constitutional or jurisdictional magnitude, the defendant must show that the error could not have been raised on direct appeal, and if condoned, would result in a complete miscarriage of justice. *Shaid*, n.7, at 232 (*quoting United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981)).

A defendant must meet the cause and actual prejudice test even when he alleges a fundamental constitutional error. *Shaid*, at 232 (*citing, Murray v. Carrier*, 477 U.S. 478, 493, 106 S.Ct. 2639, 2648 (1986)). The Supreme Court has held that the cause and prejudice standard applies to inadvertent attorney errors as well as deliberate tactical decisions. *Id.* (*citing Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 2665 (1986)).

"A change in the law amounts to sufficient cause for failing to object only if the change is so novel that its legal basis was not reasonably available or foreseeable at the time of trial. *Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910 (1984). *Murray v. Carrier*, 477 U.S. 478, 486-87, 106 S.Ct. 2639, 2644-45 (1986)(the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default). . ." *Shaid*, 937 F.2d at 231 n.5.

The only "cause" Mortimer might assert for his failure to challenge the propriety of the search prior to trial is ineffective assistance of counsel. "Failure to file a suppression motion does not constitute per se ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 2587-88 (1986). It may be that the failure to raise the suppression issue was a strategic decision. Defense counsel 'is not required automatically to file a suppression motion in every case involving evidence or statements obtained after a search; rather, counsel must use professional discretion in deciding whether there are sufficient grounds for such a motion.'" *Chavez-Valencia*, 116 F.3d at 134 (quoting *United States v. Aulet*, 618 F.2d 182, 187-88 (5th Cir.1980). The record reflects that the search in controversy took place in the Border Control checkpoint in Falfurrias, Texas. The search occurred after a drug-detecting canine alert to the undercarriage of Mortimer's truck. When a drug-detecting canine alerts in the near presence of a particular vehicle, that action is sufficient to give rise to probable cause to search that vehicle. *United States v. Dovali-Avila*, 895 F.2d 206, 207 (5th Cir. 1990). Moreover, "the mere alerting of a dog, or, to an even lesser extent, the mere walking of a dog around a particular vehicle does not, in and of itself, constitute a search." *Id.* (citing *United States v. Place*, 472 U.S. 696, 103 S.Ct. 2637 (1983) and *United States v. Lovell*, 849 F.2d 910, 913 (5th Cir. 1988)). *See also,*

6

C5APDF - www.fastio.com

*United States v. De La Rosa-Valenzuela*, 993 F. Supp. 466, 470-71 (W.D. Texas 1997). Under the facts in controversy, the agents had probable cause to execute an extensive search of Mortimer's vehicle with or without his consent. Therefore, the search of the vehicle and his detention prior to the search were reasonable. Counsel's failure to file a motion to suppress cannot be deemed unreasonable under the circumstances - the motion would have proved futile. Mortimer's right to the effective assistance of counsel was not abrogated and he cannot show cause justifying collateral relief under the first two grounds presented.

B.   Ineffective assistance of counsel: failure to renew motion for
     judgment of acquittal.

To secure relief under a complaint for ineffective assistance of counsel, a § 2255 petitioner must show (1) counsel's performance was deficient and (2) prejudice. A criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, _ U.S. _, 113 S.Ct. 838, 842 (1993)(quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984)). In *Fretwell*, the Court observed:

> [An] analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

7

CAMPDF - www.fesisc.com

_ U.S. _, 113 S.Ct. at 842-43.   The "prejudice" prong of the *Strickland* test focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.   "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."   *Id.*_ U.S. _, 113 S.Ct. at 844.   *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).

The burden falls on the accused to prove a violation of constitutional standards.   The focus is on the attorney's impact on the adversarial process; the constitutional standards may be met irrespective of an accused's evaluation.   *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984).   The Fifth Circuit has noted that:

> "prejudice" must be rather appreciable before a new trial
> is warranted in view of counsel's error.   *See, e.g.,*
> *Lockhart v. Fretwell*, _ U.S. _, 113 S.Ct. 838 (1993)...

*Spriggs v. Collins*, 993 F.2d 85, 88-89 n.4 (5th Cir. 1993); *Armstead v. Scott*, 37 F.3d 202, 207 (5th Cir. 1994).

In *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994), the Fifth Circuit reviewed the requirements for a successful ineffective assistance of counsel claim.   The court observed that in a guilty plea scenario, the petitioner must prove not only that his attorney actually erred, but also that he would not have pled guilty but for

8

CMsPDF - www.fastio.com

that error. 37 F.3d at 206 (citing *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366 (1985)). The defendant must affirmatively prove prejudice; a mere allegation of prejudice is not sufficient. The petitioner must establish that but for his counsel's erroneous advice, he would not have pleaded guilty but would have insisted on going to trial. *Armstead*, 37 F.3d at 206 (citing *Carter v. Collins*, 918 F.2d 1198, 1200 (5th Cir. 1990)); *see also*, *United States v. Payne*, 99 F.3d 1273, 1282 (5th Cir. 1996). This assessment, in turn, will depend in part on a prediction of what the outcome of the trial might have been. *Id.* (citing *Hill v. Lockhart*, 474 U.S. at 56-58, 106 S.Ct. at 369-370).

To show prejudice in the sentencing context, a petitioner must show "a reasonable probability that but for trial counsel's errors his non-capital sentence would have been **significantly** less harsh." *United States v. Segler*, 37 F.3d 1131, 1136 (5th Cir. 1994)(citing *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993)). Under this standard, the court must consider such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances. *Id.*

Although counsel's failure to renew his motion for a judgment of acquittal at the close of all the evidence heightened Mortimer's burden on direct appeal, it in no wise undermined confidence in the

9

outcome of the trial and the appeal.  The Fifth Circuit had little difficulty in determining that there was a surfeit of evidence supporting Mortimer's convictions.  (See copy of Fifth Circuit Opinion attached hereto as appendix B).  Counsel's performance did not deprive Mortimer of any constitutional rights.  Accordingly, relief on this ground must be denied.

A Section 2255 Motion requires a hearing unless the files, the motion, and the record of the case conclusively show that no relief is appropriate.  28 U.S.C. § 2255 (foll.), Rule 8(a).  *United States v. Santora*, 711 F.2d 41 (5th Cir. 1983).  The need for an evidentiary hearing depends upon an assessment of the record.  If the district court cannot resolve the allegations without examining evidence beyond the record, it must hold a hearing.  If the record is adequate to fairly dispose of the allegations, the court need inquire no further.  *United States v. Smith*, 915 F.2d 959, 964 (5th Cir. 1990).

Although the allegations of a *pro se* complaint are held to a less stringent standard than the formal pleading drafted by lawyers, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief, the cause will be dismissed.  *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594 (1972). The instant cause does not merit a hearing.

10

The government prays that the court enter an order dismissing Mortimer's motion for section 2255 relief.

Respectfully submitted,

MERVYN M. MOSBACKER
United States Attorney


By: _____

JAMES L. TURNER
Assistant United States Attorney
Federal Bar No. 1406
State Bar No. 20316950

11

## CERTIFICATE OF SERVICE

I, James L. Turner, do hereby certify that a copy of the foregoing Respondent's Answer to Section 2255 Motion, Motion To Dismiss and Brief has been mailed on this the 4th day of January, 2001, via certified mail, return receipt requested to

Mr. John Edward Mortimer
Reg No. 82407-079
FPC Eglin AFB
Eglin AFB, Florida 32542

_____
JAMES L. TURNER
Assistant United States Attorney
Federal Bar No. 1406
State Bar No. 20316950

12

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 13 of 67

# NO. 99-40257

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JOHN EDWARD MORTIMER,
Defendant-Appellant.

On Appeal from the United States District Court
For the Southern District of Texas
Brownsville Division, Criminal No. 98-CR-466

BRIEF OF PLAINTIFF-APPELLEE

MERVYN M. MOSBACKER
United States Attorney

PAULA C. OFFENHAUSER
Chief, Civil Division

ALICE ANN BURNS
Assistant United States Attorney

910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77208
(713) 567-9102

*Appendix A*

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 14 of 67

# STATEMENT REGARDING ORAL ARGUMENT

Oral argument should be denied because (1) the facts and legal arguments are adequately presented in the briefs and record and (2) the decisional process would not be significantly aided by oral argument. FED. R. APP. P. 34(A)(3).

i

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . .   i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . .   iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . .   2

STATEMENT OF ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . .   3

     A.   Course of proceedings and disposition below . . . . . . . . . . . .   3

     B.   Statement of the Facts. . . . . . . . . . . . . . . . . . . . .   3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . .   25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

     I..   MORTIMER'S DRUG CONVICTIONS WERE BASED ON
          SUFFICIENT EVIDENCE. . . . . . . . . . . . . . . . . . . . .   26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . .   39

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . .   40

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 16 of 67

# TABLE OF AUTHORITIES

## Cases
### Page

*Glasser v. United States*, 315 U.S. 60,
62 S. Ct.. 457, (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Jackson v. Virginia*, 443 U.S. 307,
319, 99 S. Ct. 2781 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Bailey*, 111 F.3d 1229
(5th Cir.), cert. denied, 118 S. Ct. 327 (1997) . . . . . . . . . . . . . . . 27

*United States v. Baptista-Rodriguez*, 17 F.3d 1354
(11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Bradfield*, 113 F.3d 515
(5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Brown*, 53 F.3d 312
(11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Caballero*, 712 F.2d 126
(5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Cardenas*, 9 F.3d 1139
(5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Carillo-Morales*, 27 F.3d 1054
(5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Dean*, 59 F.3d 1479
(5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Elam*, 678 F.2d 1234
(5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Farias*, 77 F.3d 391
(11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CUtePDF - www.texis.com

Case 1:00-cv-00171  Document 5  Filed in TXSD on 01/04/2001  Page 17 of 67

*United States v. Farias-Farias*, 925 F.2d 805
    (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Garrison*, 963 F.2d 1462
    (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Garza*, 990 F.2d 171
    (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Inocencio*, 40 F.3d 716
    (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Iriarte-Ortega*, 113 F.3d 1022
    (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Lopez*, 74 F.3d 575
    (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Martinez-Moncivais*, 14 F.3d 1030,
    1034 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Ojebode*, 957 F.2d 1218
    (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Ortega Reyna*, 148 F.3d 540
    (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Parrish*, 736 F.2d 152
    (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Pedroza*, 78 F.3d 179
    (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Posner*, 868 F.2d 720
    (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Pruneda-Gonzalez*, 953 F.2d 190
    (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Quiroz-Hernandez*, 48 F.3d 858
    (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Ramos-Garcia*, 184 F.3d 463
    (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Resio-Trejo*, 45 F.3d 907
    (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Romero-Reyna*, 867 F.2d 834
    (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Suarez*, 155 F.3d 521
    (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## RULES AND STATUTES

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

21 U.S.C. § 841(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. App. P. 34(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 19 of 67

## NO. 99-40257

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

## UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

## JOHN EDWARD MORTIMER,
Defendant-Appellant.

**On Appeal From the United States District Court
For the Southern District of Texas
Houston Division, Criminal No. 90-272-1**

## BRIEF OF PLAINTIFF-APPELLEE

The United States of America, Plaintiff-Appellee ("the government"), by the

United States Attorney for the Southern District of Texas, files this brief in response

to that of Defendant-Appellant ("Mortimer").

CSXPDF - www.fsesto.com

## STATEMENT OF JURISDICTION

The jury returned its guilty verdict on November 23, 1998 (1 R. 33).

Mortimer was sentenced on February 18, 1999 (1 R. 25).[1] On February 25, 1999,

Mortimer filed a notice of appeal (1 R. 17-18), and a motion for new trial

challenging the sufficiency of the evidence and error in the admission of evidence

(1 R. 19-22). The judgment of conviction was entered by the district court (Tagle,

J.) on March 1, 1999 (1 R. 11-16). On June 1, 1999, the district court denied

Mortimer's motion for new trial as untimely filed (1 R. 1). The district court's

jurisdiction was invoked pursuant to 18 U.S.C. § 3231. This Court's jurisdiction

was invoked pursuant to 28 U.S.C. § 1291. See, Fed.R.App.P. 4(b)(2), (3). Cf.,

United States v. Garrison, 963 F.2d 1462, 1463-67 (11th Cir. 1992)(filing of notice

of appeal before disposition of timely new trial motion in a criminal case).

## STATEMENT OF THE ISSUE

Whether the evidence was sufficient to support Mortimer's conviction for

conspiracy to possess with intent to distribute a quantity exceeding 100 kilograms

of marijuana, in violation of 21 U.S.C. § 846 (Count 1); and aiding and abetting in

the possession with intent to distribute a quantity exceeding 100 kilograms of

marijuana, in violation of  21 U.S.C. § 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2

(Count 2).

---

"R" refers to the record on appeal. "GX" refers to government exhibit.

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 21 of 67

# STATEMENT OF THE CASE

A.  <u>Course of proceedings and disposition below.</u>

On September 1, 1998, a grand jury in the Southern District of Texas, Brownsville Division, Criminal Action No. B-98-466-1, charged Mortimer with conspiracy to possess with intent to distribute a quantity exceeding 100 kilograms of marijuana, in violation of 21 U.S.C. § 846 (Count 1); and aiding and abetting in the possession with intent to distribute a quantity exceeding 100 kilograms, that is, approximately 122.2 kilograms (269 pounds), gross weight, of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2 (Count 2)(1 R. 190-91).  Mortimer proceeded to trial.  On November 23, 1998, the jury found Mortimer guilty of the two counts charged in the indictment (1 R. 33).  On February 18, 1999, the district court sentenced Mortimer to concurrent terms of 80 months as to the two counts of conviction, to be followed by four years of supervised release, and ordered that he pay special assessments totaling $200 (1 R. 11-16).

B.  <u>Statement of the Facts.</u>

In 1991, DeWayne Smith, an independent truck driver since 1981, began working for the United States Customs Service as an occasional informant.  His commercial truck driving experience included driving refrigerated and non-refrigerated 18-wheel tractor-trailer rigs.  Based on his experience, DeWayne knew

CIVPDF - www.fesiio.com

that an idle tractor-trailer rig with no cargo is not profitable to the driver. Truck drivers generally are paid by the load's weight and destination (2 R. 38-45).

The trucking industry is regulated by the Intestate Commerce Commission. Drivers are required to file with the ICC quarterly reports indicating number of miles traveled, hours worked per week, routes and destination (2 R. 93, 96). A driver may drive 10 hours per day. He then is required to be "off" 10 hours unless he has a co-driver (2 R. 94). Most truck drivers sleep in the "sleeper" area of the tractor (2 R. 94-95). A truck driver maintains a daily logbook in which he records hours on duty (driving), hours on duty not driving (e.g., waiting for a load, trailer repair, stopping for gas), hours off-duty (e.g., out of the truck on vacation), hours driving, hours sleeping, and miles driven in each state. The original logbook entries are forwarded to the ICC. The driver retains a carbon copy (2 R. 95-102; see e.g., GX21). Truck drivers are required to have a commercial driver's license (2 R. 97).

DeWayne had assisted Customs in 70 cases for which he had been paid approximately $400,000 (2 R. 45-46, 47-48). DeWayne received $8,000 for his assistance in the instant case (2 R. 49). As part of his investigative work, DeWayne generally scouts local areas looking for idle tractor trailer rigs at motels or parking lots. It is suspicious to him if a rig has sat idle for several days as the driver cannot make a profit unless he is hauling cargo (2 R. 46-47).

CVisPDF - www.fasisi.com

In mid-June 1998, DeWayne spotted a black Freightliner with a refrigerated trailer, both bearing Florida license plates, parked in the back row at a truck stop located between Harlingen and Combs, Texas (2 R. 49-50, 66). The truck's passenger side window was open and the truck and trailer were unhooked (2 R. 49-50). DeWayne thought the rig appeared abandoned (2 R. 50). He jotted down the license plate number and the name of the company, Ashman Truck Lines, depicted on the truck's side door. The company name on the door was different from the name depicted on the tractor's sleeper area, KDS Trucking, Coconut Creek, Florida (2 R. 50-55; GX1-7, 38B). The open passenger window aroused DeWayne's suspicion. Since the parking lot was dirt, the dust kicked up by trucks driving in the area allowed dirt to infiltrate the tractor, the driver's "home on wheels" (2 R. 55). DeWayne related this information to Customs agents (2 R. 51).

When DeWayne returned to the truck stop at 8:00 a.m. the next day, the tractor trailer rig was still parked at the lot (2 R. 55). DeWayne noticed dew on the windshield (2 R. 56). DeWayne advised Customs agents of this information and said he planned to make "drive-bys" until he could identify the rig's driver (2 R. 56).

The following morning, DeWayne saw two black males at the truck stop's pay phone (2 R. 56, 66). DeWayne at trial identified Mortimer as one of the men (2 R. 56-57). Mortimer was using the phone while his companion stood nearby reading a truck trailer magazine (2 R. 57). After completing his call, Mortimer and his

5

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 24 of 67

companion entered a Ford custom van bearing North Carolina tags (2 R. 58). Mortimer meanwhile radioed the van's tag number to Customs and told the agent he planned to follow the van (2 R. 59). Mortimer followed the two occupants of the van as they 5-6 times traveled south on the Highway 77 frontage road to the Harlingen cut-off, made a U-turn, and circled back toward the truck stop (2 R. 59-60). They eventually drove to a motel located on Business Highway 77 in Harlingen (2 R. 61).

After meeting with U.S. Customs Special Agent Danny Ybarra, DeWayne returned to the truck stop to continue surveillance on the black Freightliner (2 R. 61-62). About three hours later, DeWayne telephoned the phone number printed on the tractor. Posing as a truck stop security officer, DeWayne told the woman who answered the phone that the truck appeared abandoned (2 R. 62). The woman replied that she would page the driver (2 R. 63). Forty-five minutes later, the Ford Custom van arrived at the truck stop carrying Mortimer and two black males (2 R. 63). Mortimer and one of the men walked over to the trailer while the third man in the van left the truck stop and drove north on the frontage road before pulling over (2 R. 63). Meanwhile, Mortimer and his companion entered the tractor and drove the rig to the front of the truck stop (2 R. 63). The van returned to the truck stop and the two vehicles, the rig and the van, left the area driving south on Highway 77 (2 R. 63-64).

Mortimer in the tractor trailer rig turned onto Highway 83 toward McAllen
(2 R. 64). DeWayne continued to follow Mortimer as he turned onto Highway 281
north and traveled to the Falfurrias checkpoint (2 R. 64). At the checkpoint the rig
was directed to the secondary inspection station where an agent opened the trailer's
rear doors and observed that the trailer was empty (2 R. 65). Mortimer and his
companion then left the checkpoint traveling north on Highway 281. No contraband
was seized from the tractor trailer rig on this occasion (2 R. 66).

Two months later, in August 1998 at approximately 9:30 a.m., DeWayne
spotted the black Freightliner rig parked at a Best Western motel located on
Highway 83 west between Harlingen and La Feria (2 R. 67-68). DeWayne notified
Customs agents he had spotted the rig and planned to observe its activities (2 R. 68,
242). At 10:15 a.m., Mortimer, as driver, and another black male entered the rig
(2 R. 68-69). Mortimer drove to W&B Refrigeration, a transport refrigeration
repair shop located in Harlingen, where he disconnected the trailer from the tractor
and parked them side-by-side (2 R. 69-70, 205-06). After entering the shop,
Mortimer and his companion left the area in a taxi and returned to the Best Western
motel (2 R. 70).

After following Mortimer to the motel, DeWayne returned to the repair shop
where he met Customs Agent Ybarra. The two men maintained surveillance on the

7

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 26 of 67

repair shop (2 R. 71, 242).  Agent Ybarra briefly returned to the Best Western and learned that Mortimer and his companion were staying in Room 137 (2 R. 243).

Around noon, the trailer was backed into the shop's bay area (2 R. 71).  The tractor meanwhile remained parked in the shop's lot and was not approached for repairs (2 R. 72).  DeWayne found this unusual because Mortimer and his companion could have returned to the motel in the tractor instead of taking a cab (2 R. 71-73).  At 6:00 p.m., a W&B mechanic was still working on the black Freightliner trailer (2 R. 73).  At 6:15 p.m., Mortimer arrived at the shop via cab (2 R. 73).  Mortimer re-hooked the tractor and trailer and returned to the motel (2 R. 73-76, 111-14; GX13-15).  DeWayne maintained surveillance on the motel until 10:00 p.m..  During that time he observed a black male walk to the rear of the trailer and then return to his room (2 R. 76).

DeWayne arrived at the motel at 7:00 a.m. the next morning, August 11, 1998 (2 R. 77, 122).  At 9:00 a.m., DeWayne observed Mortimer and another male, later identified as Andrew Smith ("Andrew"), a resident alien from the Bahamas, eating breakfast in the restaurant.  After breakfast, Mortimer made a call from a pay phone before returning to his room (2 R. 79, 137, 245; GX16[Mortimer's photograph]; GX17[Andrew Smith's photograph]).  An hour after breakfast,

CutePDF - www.fexio.com

Mortimer, as driver, and Andrew entered the tractor trailer rig and drove toward McAllen. They stopped at the Silver Spur Truck Stop in Pharr, Texas, located off Highway 281 north where they remained all day (2 R. 79-82). During part of that time, Mortimer and Andrew left the tractor and entered the brokerage offices/snack bar area of the truck stop (2 R. 81-82). DeWayne and Agent Ybarra observed their activities at the truck stop (2 R. 244). The brokerage office closed at 5:00 p.m. but Mortimer and Andrew remained at the truck stop (2 R. 246). Agent Ybarra left the truck stop at 7:00 p.m. (2 R. 246).

At 8:00 p.m., while DeWayne was in the snack bar area with Mortimer and Andrew, he heard Mortimer's pager go off (2 R. 85). After Mortimer made a call from a pay phone, he and Andrew left the snack bar and entered the rig (2 R. 85). Mortimer drove the rig across Highway 281 to a CITGO gas station. While Mortimer made 6-7 calls from a pay phone, Andrew first filled the tractor's gas tank on the driver's side and then the "reefer" with gasoline (2 R. 85-86). No effort was made to fill the gas tank on the tractor's passenger side (2 R. 90).

The tractor of a long-distance rig is equipped with two 150-gallon gas tanks, one on each side of the tractor, for a total capacity of 300 gallons. Gas stations have pumps which permit both tanks to be fueled with only one read-out, in other words,

CMsPDF - www.fasisu.com

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 28 of 67

it is not necessary for the driver to turn the rig around in order to fuel both tanks. The gas tank on the tractor's driver's side is located in an area underneath the exhaust pipe. It is equipped with a spring-loaded latch and fairing that runs inside the tank. The gas tank on the tractor's passenger side is similarly located between the wheels (2 R. 87-88; GX49). The "reefer" is the refrigeration unit of the trailer. The gas tanks on most "reefers" are located on the driver's side and have a 33-gallon capacity. The gasoline powers the refrigeration unit (2 R. 88-89).

After filling the gas tanks, Andrew walked over to Mortimer who hung up the pay phone (2 R. 90). Mortimer and Andrew entered the gas station, then the tractor trailer rig (2 R. 91). DeWayne followed them as Mortimer drove the rig north on Highway 281 30-40 miles to San Manuel north of Edinburg, Texas (2 R. 91-92). Meanwhile, DeWayne had notified Agent Ybarra of the rig's movement (2 R. 246-47).

U.S. Border Patrol Agent Aaron Blair was working the 4:00-8:00 p.m. shift at the Falfurrias checkpoint located 65 miles north of McAllen, Texas (2 R. 121-22). At 9:30 p.m., Blair and other agents at the checkpoint had received information from Agent Ybarra to be on the lookout for a black Freightliner, with Ashman Trucking depicted on the tractor, hauling a white trailer. Ybarra indicated that the vehicle possibly was carrying narcotics (2 R. 123-24, 142, 247). Mortimer driving the black Freightliner and trailer approached the Falfurrias checkpoint at 10:00 p.m.

10

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 29 of 67

(2 R. 126-27, 136). Mortimer drove 15-30 feet past the stop sign at the checkpoint before stopping (2 R. 127-28).

Agent Blair stepped up to the driver's window and asked Mortimer if he was a U.S. citizen. Mortimer replied yes. Mortimer also told the agent that a passenger, referring to Andrew, was in the sleeper (2 R. 129-30, 138). As Agent Blair questioned Mortimer, he noticed Mortimer fidgeting in his seat, moving the gear shift and acting as if he were in a hurry (2 R. 131-33). Mortimer agreed that Agent Blair could have a closer look at the vehicle and drove to the secondary inspection station 30-40 yards to the right (2 R. 130-31). While Mortimer was driving to the secondary inspection area, Agent Blair flashed his flashlight inside the checkpoint station to alert other agents that he wanted them to "run the dog", that is, run a canine around the vehicle to see if he alerts (2 R. 133-34, 142-43, 185).

Agents Raymond Lee and Jonathon Hawley emerged from the office (2 R. 135). As Agent Hawley walked the canine around the tractor trailer rig (2 R. 135), Agent Lee stood next to Mortimer and Andrew who were seated on a bench by the door to the station (2 R. 144-45). Agent Lee, who is from Miami, Florida, noticed the rig's Florida tags and asked Mortimer if that was where he was from. Mortimer replied he was from Vero Beach, Florida (2 R. 145). Agent Lee next asked Mortimer what he was hauling. Mortimer answered that the truck was empty. He further stated he had traveled to McAllen to pick up a load but had learned that his

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 30 of 67

refrigeration unit was broken and too expensive to repair in "the valley". Mortimer said he was en route to Houston to have the refrigeration unit repaired (2 R. 145-46, 164).

Another agent asked Mortimer and Andrew to come inside the checkpoint station. Agent Lee escorted them to the station's interview room (2 R. 146). As Agent Lee left the station, he noticed that Mortimer and Andrew were standing by the plate glass window and looking out toward the truck (2 R. 146).

As Agent Lee approached the rig, Agent Hawley said he wanted to "run" the dog again, that there was something curious about the truck (2 R. 147, 185-86). As the dog walked around the truck's front end at the driver's side, it crawled underneath and laid down, indicating she had alerted (2 R. 147, 182-83). Agent Lee examined the driver's side while Agent Hawley examined the passenger's side (2 R. 147). Hawley noticed that when he tapped on the passenger-side gas tank, a portion of the tank gave a solid sound instead of a normal hollow ring. Agent Hawley surmised that the tank contained a concealed compartment of contraband (2 R. 187-88).

Agent Hawley called Agent Lee over to the passenger's side (2 R. 149, 188). Agent Hawley had removed the fuel cap from the fuel tank and had shined his flashlight inside the tank. Visible inside the tank was what appeared to be a metal wall situated three inches inside the tank and equal distance to the tank's sides (2 R.

CutePDF - www.fenito.com

149-51, 191-92).  When the agents tapped on the fuel tank (made of aluminum) on

the passenger side, part of it responded with a hollow ring while part of it gave a

loud thud with no ringing sound.  Agent Lee similarly noticed that the driver's side

fuel tank when tapped gave a hollow ringing sound (2 R. 151-53). The metal beneath

the driver's side fuel tank appeared normal (no new paint, etc.), but the metal on the

passenger's side fuel tank was "distorted,", that is, the metal appeared to have been

welded (2 R. 153-54).

Two metal bands secured the fuel tanks to the truck's chassis.  When Agent

Lee used a tool to remove the long bolt and nut that held the bands in place, he

noticed that the threads on one of the bolts were clean but the threads on the other

bolt were covered in road tar and grime (2 R. 154-55, 165-67, 174; GX45, 50).

Agent Lee thought that the clean bolt had been removed recently due to its

appearance (2 R. 155). The fuel tank was smudged with oil and hand prints which

Lee also thought unusual (2 R. 189, 194). Underneath the band which had been

secured with the clean bolt, the agents discovered a piece of rubber which covered

a jagged cut into the fuel tank (2 R. 155).  It appeared to Agent Lee that this portion

of the tank had been cut: "that portion of the tank had been cut off and then they

placed another ring of aluminum on the inside and held it in place with screws and

that way the bottom portion that would come off would fit right on, kind of like a

lid on a pot or something like that" (2 R. 156).  Although Agent Lee removed this

CutePDF - www.tesio.com

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 32 of 67

"lid" by tapping it with a hammer, he determined it could easily be removed by hand

(2 R. 156, 168-70, 190, 192; GX51). The cap had around it insulation or expansion

foam, similar to "Stuff" obtained from Home Depot. Agent Lee surmised that the

foam had been there for some time because it was discolored (2 R. 159, 168-69,

170-71). When the lid was removed, Agents Lee and Hawley saw packages of

contraband inside the fuel tank (2 R. 156-60, 190; GX9-12[depicting area inside the

fuel tank]). An agent cut into the contraband and determined that it was marijuana.

Thirty-three bundles, totaling 269 pounds, of marijuana were removed from the fuel

tank (2 R. 161, 171-72, 192-93 [see 2 R. 199-200, 203, 256 (stipulation that

contraband was marijuana; GX18-20)). Each bundle was tightly packed in a layer

of cellophane, a layer of automotive grease (rear end axle grease), another layer of

cellophane and another layer of grease (2 R. 172, 190, 258). The marijuana's

packaging precluded the identification of fingerprint evidence (3 R. 274). The

marijuana was valued at $215,200 (3 R. 274-75). The fuel tank measured 4-5 feet

long and 2.5 to 3 feet wide (2 R. 169). Approximately two-thirds to three-fourths

of the passenger side fuel tank had been used to store the marijuana (2 R. 170).

Agent Ybarra was notified that contraband had been found and he and Customs

Agent Mark West proceeded to the Falfurrias checkpoint (2 R. 248).

    According to Agent Ybarra, it took special skill to create the fuel tank's secret

compartment. This skill involved cutting the tank, welding to seal it completely, and

submerging the tank in some kind of liquid to remove gas residue and vapors so the welding could be accomplished (3 R. 275-76).

Agent Lee found inside the sleeper area of the tractor some nuts and bolts like the ones he had removed from the metal band and gas tank (2 R. 163, 174-75; GX37A, 39A).Other items removed from the trailer included pillows, blankets, luggage, clothing, shoes, a briefcase and cellular phones (2 R. 164, 259-61; GX41, 58). The trailer was empty (2 R. 172; GX8). Agents seized from the tractor Mortimer's daily logbook and miscellaneous fuel receipts (2 R. 261-62, 263; GX21, 22-28). The gas receipts showed travel between North Carolina and Texas and generally were in amounts of 150 gallons or less. One receipt showed 157 gallons of gas (2 R. 265). A W&B Refrigeration Service invoice, a W&B Refrigeration repair receipt dated August 10, 1998, and cab receipts dated August 10, 1998, were seized from Mortimer's person (2 R. 262-63; GX30, 31, 42). Mortimer's daily logbook showed that he left Raleigh, North Carolina, on August 8, 1998, and traveled with an empty trailer to Atlanta, Georgia, Arkansas and Houston, Texas, before arriving in Harlingen on August 10, 1994, at 4:00 a.m. (2 R. 266-69; GX21, 34 [time-line]). He had no co-driver (3 R. 287).

Agent Lee knew "from being a mechanic" that truck drivers generally are fuel conscious and check their fuel daily (2 R. 176-77). If the driver had filled the tanks before he left the valley, he would not necessarily have known there was a problem

15

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 34 of 67

(2 R. 177-78). Agent Lee did not examine how the fuel system was set up on the tractor trailer rig (2 R. 177-78). A driver who has operated a tractor trailer rig for several months would be suspicious if he could fill up one of the gas tanks but not the other (2 R. 180).

Other items seized from the tractor included an Ace Hardware bag which contained various nuts, bolts and washers similar to those used to connect the cowling (step-down parts of the tractor). A second bag of similar nuts, bolts and washers, all used in appearance, as well as brackets were found under a blanket in the sleeper area (2 R. 173-74, 233-36, 239-40; GX35, 35A, 36, 36A, 39, 43-46, 50). Photographs depicted the socket area that fit the bolt which held the band that retained the fuel tank onto the chassis (GX35C); a crate which contained a can of black spray paint retrieved from the tractor (GX38, 38A); the nut for the fuel tank's retaining band (GX35B); and nuts, bolts, screws and washers found on a shelf inside the tractor's sleeper area (GX37) (2 R. 232-33, 236-41).

After the marijuana was found, Agent Blair advised Mortimer and Andrew of their constitutional rights while they were seated in the checkpoint station's interview room (2 R. 135, 138, 197, 263; GX32). Mortimer told Agent Blair he did not want to say anything (2 R. 138). He told Agent Hawley he did not want to say anything about the case at that time (2 R. 198).

16

CMPDF - www.fenrir.com

After Agents Ybarra and West arrived at the checkpoint, Ybarra again read
Mortimer his constitutional rights from a card (2 R. 250-51, 263). Mortimer told
Ybarra he wished to cooperate (2 R. 251). In response to questioning, Mortimer
said he had traveled to the valley from Raleigh, North Carolina, to pick up a load
of mangos. He claimed he had tried to obtain a load at the Silver Spur Truck Stop
but the brokers had said he needed to wait a couple of days because they could not
find a load for him. Mortimer claimed he had become angry and decided to return
to North Carolina empty (2 R. 251). When Agent Ybarra told him he had been seen
in the valley a month-and-a-half earlier, Mortimer became agitated and upset, saying
this was his first trip (2 R. 252-53).

Mortimer denied knowledge of the marijuana (2 R. 253). He claimed that a
third man had traveled with him from North Carolina but he did not know the man's
name (2 R. 253-54). Mortimer stated that this unknown man had come to his motel
room on August 10, 1998, at 10:00 p.m. and asked to borrow the tractor trailer rig
to drive to the store. Mortimer said he loaned the man the rig. Mortimer first told
Agent Ybarra that the man returned the keys approximately two hours later, but then
clarified that the keys were returned the next morning (2 R. 254-55). Mortimer
claimed that the unknown man had traveled with him from North Carolina because
the company did not trust Mortimer with the money (2 R. 255). Mortimer said
Andrew Smith was his best friend and had traveled with him to keep him company

17

CNMPDF - www.fineho.com

(2 R. 255-56). When Agent Ybarra questioned Andrew, Andrew said he thought the unknown man was named "Johnie" (3 R. 279). Agent Ybarra subsequently learned that one David Grant from Raleigh, North Carolina, had stayed at the same Best Western, Room 231, on August 9-11, 1998. Grant had paid for his room with cash (3 R. 283-85; DX1-2).

Records maintained at W&B Refrigeration in Harlingen indicated the following repairs to the trailer refrigeration unit located on the nose of the trailer: on August 10, 1998, the unit's freon was recharged and the battery terminal replaced at a cost of $1,227.26 (GX29-first page); on July 22, 1998, a refrigeration line, suction vibrasorber was replaced at a cost of $183.16 (GX29-second page)(2 R. 206-10). These bills were paid in cash (2 R. 210). No work was performed on the tractor (2 R. 210).

A W&B Refrigeration employee identified Mortimer as the man requesting repairs on the trailer on July 22, 1998, and August 10, 1998 (2 R. 204-09). When Mortimer requested at W&B that the refrigeration unit be repaired on July 22, 1998, he asked that the unit refrigerate (2 R. 213). The unit had a blown suction vibrasorber. When that repair was made, it was determined that the freon needed to be recharged. Due to the cost, Mortimer said he did not have the money to recharge the freon. Mortimer returned on August 10, 1998, to complete the repairs. The freon was recharged and an SV valve was replaced. When   the W&B

18

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 37 of 67

technician reported the need for additional repairs to make the unit operate, Mortimer declined. saying that if he did not get a load of cargo that night, he would return the next day to finish the repairs (2 R. 213-14). Mortimer did not return the next day (2 R. 214). It was not necessary for Mortimer to leave the tractor at W&B as the repairs were made to the trailer's refrigeration unit (2 R. 215-16). The yard around W&B is fenced (2 R. 215).

In February 1992, Mortimer was arrested in Medley, Dade County, Florida, on charges involving the seizure of 659 pounds of marijuana. Regarding this incident, Mortimer, accompanied by two persons, arrived at Allied Chemicals in a pickup truck around midnight and had a one-ton chlorine cylinder loaded into the truckbed. This was a controlled delivery as a police officer was working undercover at the plant. Mortimer requested this particular one-ton cylinder by number. Mortimer, driving the truck, was followed by police officers for 30 minutes until he and his companions noticed the police surveillance. Mortimer and his passengers abandoned the truck. The two passengers were captured but Mortimer eluded the police and was arrested two weeks later when he turned himself into the authorities. The marijuana had been concealed inside the cylinder through an opening that had been welded shut. Mortimer was convicted on the drug charges (2 R. 221-31; GX52-57).

19

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 38 of 67

## Defense Case.

Forty-one-year-old John Mortimer, a resident of Hollywood, Florida, testified that he owned a tractor-trailer and made his living hauling storm debris. He denied committing the 1992 Florida drug crime (3 R. 300-03). He claimed that in June 1998, while working in Norcross, Georgia, he had received a telephone call from Earl Ashman. Earl asked him to ride with a driver to Texas and Mortimer agreed.

Mortimer testified that in July, 1998, Earl and the driver, whose last name was Dryer and whose first name started with "E", came to Mortimer's hotel. The three then traveled to North Carolina (3 R. 301, 305-06). Mortimer rode with the driver to Texas to pick up a load of potatoes which was to be transported to New York (3 R. 306). However, the "unit" was not working properly. Mortimer and the driver went to W&B Refrigeration where they learned the repairs would cost $800 (3 R. 306). Mortimer telephoned Earl who told him to get a dry load (3 R. 306). Mortimer testified that "me and Earl picked up the truck from W&B Refrigeration" (3 R. 307). Mortimer subsequently telephoned Earl that he was concerned about the risk involved in personally signing for a loan for the trailer when it was not repaired properly. He asked to return to North Carolina (3 R. 307). En route, the driver got a speeding ticket in Texas and hit a post, damaging the trailer (3 R. 307). After Mortimer arrived in North Carolina, he flew back to Georgia (3 R. 307). The logbooks that belonged to Earl and the driver were left in

20

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 39 of 67

the tractor (3 R. 308). Mortimer denied being in South Texas in June 1998 (3 R. 308).

Around August 1998, Earl again telephoned Mortimer and asked him to accompany his driver to Texas to pick up a load (3 R. 309). Mortimer agreed, and flew from Atlanta, Georgia, to Raleigh, North Carolina, arriving on August 7 or 8, 1998 (3 R. 309, 312). After Mortimer checked into a hotel, he paged Earl who told him to come to another hotel where the truck was parked (3 R. 310, 312). At the hotel, Mortimer met Earl and "another guy" whose name Mortimer did not recall: "They call– not Johnie. It was just – oh, boy, what is it? They called him – started with a D. I can't remember his name. Duane? I can't remember his name offhand" (3 R. 310).

According to Mortimer, however, some guy other than Earl gave the money to "Johnie". Mortimer asked what was going on and Earl told him "the other guy bought the truck or something". Mortimer was concerned because "if anybody else was on the truck [he] did not want to get involved... " (3 R. 312). Earl told Mortimer that the tractor trailer had been picked up from the shop, was repaired and ready to go (3 R. 313). Mortimer testified that when he saw the trailer in North Carolina, it had a car inside, but they left the car in North Carolina. It can be inferred that the trailer was empty (3 R. 316-17).

21

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 40 of 67

Two days after his arrival in Raleigh, Mortimer and "Johnie" drove to Atlanta in the rig. "Johnie" drove the truck. Mortimer told the officers who arrested him he thought the driver's name was "John" or "Johnie" or something like that (3 R. 314).

Mortimer and "Johnie" met Andrew in Atlanta. Andrew had flown from Florida to Atlanta to help Mortimer drive the truck although Andrew did not have a commercial driver's license (3 R. 314, 315). Mortimer testified that the doctor told him he has "sleep adnausea" which is like "dropsy sleep", meaning he has a problem with falling asleep (3 R. 314-15). Mortimer, "Johnie", and Andrew then drove from Atlanta to Harlingen. "Johnie" drove from Houston to Harlingen although the logbook showed that Mortimer drove that leg of the trip (3 R. 320). Mortimer rented a room for the three of them but when he told "Johnie" he could not smoke in the room, "Johnie" got his own motel room (Room 231) (3 R. 315-16).

On August 10, 1998, Mortimer and Andrew discovered that the refrigeration unit would not run continuously. Mortimer telephoned Earl who told him, "You got to hook this wire to it and that" (3 R. 317). Mortimer told Earl he did not like going through all the trouble because they had a load to pick up (3 R. 317). Mortimer and Andrew took the tractor and trailer to W&B Refrigeration and learned it would cost $1,700 to "fix the whole thing with mufflers and all kind of stuff he said needed on it" (3 R. 317-18). Mortimer thought this "ridiculous". He telephoned Earl who

22

asked that the trailer be repaired at a cheaper price. Mortimer let them repair what he thought was a reasonable price. Mortimer unhooked the tractor from the trailer and left them both at the repair shop. Earl had asked if the lights on the tractor could be fixed (3 R. 318-19). Mortimer and Andrew then returned to the motel in a taxi (3 R. 319). At 5:30 p.m., Mortimer telephoned W&B and learned that the $1,200 worth of repairs to the trailer had been made but the unit would overheat when turned off and on (3 R. 321-22). Mortimer returned to W&B in a taxi and paid for the repairs (3 R. 322-23).

When Mortimer returned to the motel, he went to sleep (3 R. 324-25). At approximately 8:00 p.m., "Johnie" telephoned Mortimer and said he wanted to go get something to eat. "Johnie" then came to the room and borrowed the rig (3 R. 325). At 7:30 a.m. the next day, "Johnie" came to Mortimer's room and said he had received an emergency phone call and had to leave on a plane (3 R. 326). "Johnie" gave Mortimer $500 for gasoline (3 R. 327). Mortimer paged Earl Ashman but Earl did not telephone him (3 R. 327). Someone had given Mortimer a phone number for "Phillip" who had the load of mangos (3 R. 327). "Phillip" told Mortimer to come to the truck stop. Mortimer and Andrew then went to the truck stop as instructed (3 R. 327-28). "Phillip" contacted them and said he could load the truck the next morning and would give Mortimer $2,800 as travel money to New York (3 R. 328-29).

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 42 of 67

Mortimer meanwhile had decided to drive to Houston and obtain the parts for the "unit" because that was where W&B obtained parts (3 R. 318). Mortimer told Phillip he was going to Houston to complete the repairs on the trailer (3 R. 329). Mortimer and Andrew then headed for Houston (3 R. 329). Mortimer denied all knowledge of the marijuana (3 R. 329-30).

On cross-examination, Mortimer testified he had known Earl Ashman for about a year (3 R. 335). When Earl telephoned him about the trip to Texas, he said the driver did not know his directions and was not good with the truck. This was the driver's first time to drive a truck. Mortimer had never been to South Texas but he knew how to read a map (3 R. 337-38). Mortimer had the sleep disorder about two years (3 R. 340). He said that "Dryden" was with him during the July 22, 1998, trip to Texas (3 R. 346-47). According to Mortimer, he was hoping to get another load in Houston so he would not have to return to Harlingen (3 R. 348). Mortimer admitted he paid $90 for gas at the CITGO station and that he had $28 in his wallet when arrested. He claimed that the rest of the $500 "Johnie" had given him for gasoline also was in his wallet (3 R. 350-51). According to Mortimer's bank records, he paid Andrew $777 on July 8, 1998, and $400 on August 8, 1998 (3 R. 353-58). Mortimer produced canceled checks he allegedly cashed on June 17 and 19, 1998, as evidence that he was not in Harlingen, Texas, on those dates (3 R. 362-

24

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 43 of 67

65). Mortimer's pastor testified that he was a faithful and honest Christian man (3 R. 367-71).

## SUMMARY OF ARGUMENT

Mortimer's convictions for conspiracy and aiding and abetting in the possession with intent to distribute marijuana were based on sufficient evidence. Mortimer was driving the tractor at the Falfurrias checkpoint when 269 pounds of marijuana worth $215,000 were found concealed in the fuel tank on the tractor's passenger side. Circumstantial evidence demonstrated Mortimer's guilty knowledge. Mortimer, an experienced truck driver, knew it was not profitable to drive an empty rig. Nonetheless, he had an empty trailer when he traveled from North Carolina to the Harlingen area on August 8-10, 1998, and when arrested on August 11, 1998. At the checkpoint, Mortimer drove past the stop sign and appeared nervous to the agent. He also displayed a keen interest in the canine search of the rig.

Before the marijuana was found, Mortimer told the authorities he was en route to Houston to have repairs completed on the refrigeration unit. After the marijuana was found, Mortimer told the authorities he had not obtained a load, had become angry and he had decided to return to North Carolina empty. Mortimer also claimed that a man whose name he could not remember had traveled with him from North Carolina and had borrowed the rig. Mortimer further claimed the August 1998 trip was his first trip to South Texas in contrast to the testimony of the W&B

25

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 44 of 67

Refrigeration employee who said Mortimer had the trailer repaired on July 22, 1998. This evidence, along with evidence that Mortimer was the rig's driver, hardware similar to that used on the fuel tank was found in the tractor, fuel receipts showed that only one of the fuel tanks was filled with gasoline during the trip, and that Mortimer went to the Falfurrias checkpoint as he had done in June 1998 rather than the Sarita checkpoint, was properly considered by the jury as evidence of Mortimer's guilty knowledge. Moreover, Mortimer was in possession of 269 pounds of marijuana worth $215,200. Drug dealers generally do not countenance the presence of persons not associated with the illegal scheme.

## ARGUMENT

I.  MORTIMER'S DRUG CONVICTIONS WERE BASED ON SUFFICIENT EVIDENCE.

Mortimer has raised two points of error on appeal. He contends that the district court erred in denying his Fed.R.Crim.P. 29(a) motion as to the conspiracy and substantive crimes charged against him. The district court denied Mortimer's Fed.R.Crim.P. 29(a) motion at the close of the government's case-in-chief (3 R. 293-94). Mortimer did not renew his Rule 29(a) motion at the close of his defense case (3 R. 378-79), and did not file a motion for judgment of acquittal within 7 days of the verdict. His insufficiency of the evidence claims must be reviewed for

manifest miscarriage of justice. *United States v. Bailey*, 111 F.3d 1229, 1235 (5th Cir.), cert. denied, 118 S. Ct.. 327 (1997); *United States v. Elam*, 678 F.2d 1234, 1247 (5th Cir. 1982); *United States v. Farias*, 77 F.3d 391, 394 (11th Cir. 1996). The government has combined its response to both of Mortimer's appellate issues in the following discussion.

Generally, appellate courts consider the evidence adduced at trial, whether it be direct or circumstantial, or both, together with all inferences reasonably drawn from it in the light most favorable to the prosecution. The Court must determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct.. 457, 469 (1942); *United States v. Bradfield*, 113 F.3d 515, 525 n.30 (5th Cir. 1997).

It is "not for the [reviewing appellate court] to weigh the evidence or to determine the credibility of the witnesses." *Glasser*, 315 U.S., at 80, 62 S. Ct., at 469; *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt. *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995); *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). A jury "is free to choose among

27

Case 1:00-cv-00171    Document 5    Filed in TXSD on 01/04/2001    Page 46 of 67

reasonable constructions of the evidence." *Lopez*, 74 F.3d at 577. Mere presence

at the scene of the crime standing alone is insufficient to prove guilt. *Bradfield*, 113

F.3d at 825 n.34; *United States v. Carillo-Morales*, 27 F.3d 1054, 1065 (5th Cir.

1994). Presence is a significant factor to be evaluated within the context of the

circumstances under which it occurs. *See United States v. Dean*, 59 F.3d 1479,

1486 (5th Cir. 1995).

To prove conspiracy to possess with intent to distribute a controlled substance,

the government was required to prove beyond a reasonable doubt that an agreement

existed between two or more persons to violate the narcotics laws, that the defendant

knew of the conspiracy and intended to join in it, and that the defendant voluntarily

participated in the conspiracy. *United States v. Inocencio*, 40 F.3d 716, 725 (5th

Cir. 1994). "No evidence of overt conduct is required; [a] conspiracy agreement

may be tacit, and the trier of fact may infer an agreement from circumstantial

evidence," including evidence of concert of action between co-conspirators. *Id.* A

person does not have to play a major role in the criminal enterprise to sustain a

conspiracy conviction, and although mere presence at the scene of the crime is not

sufficient by itself to authorize a conviction, the jury may consider that fact together

with other evidence of guilt in reaching its verdict. *United States v. Parrish*, 736

F.2d 152, 157 (5th Cir. 1984).

Case 1:00-cv-00171    Document 5    Filed in TXSD on 01/04/2001    Page 47 of 67

To prove possession with intent to distribute a controlled substance, the government was required to prove beyond a reasonable doubt that the defendant knowingly possessed drugs with the intent to distribute them. *United States v. Quiroz-Hernandez*, 48 F.3d 858, 868 (5th Cir. 1995). Possession may be actual or constructive, *Id.*, and may be proven by circumstantial or direct evidence. *United States v. Ojebode*, 957 F.2d 1218, 1223 (5th Cir. 1992). Constructive possession has been defined as "ownership, dominion or control over the [premises/ conveyance] in which the contraband was concealed." *United States v. Posner*, 868 F.2d 720, 722-23 (5th Cir. 1989). Constructive possession also has been defined as "the knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance." *United States v. Cardenas*, 9 F.3d 1139, 1158 (5th Cir. 1993). "'[P]roof that possession of contraband is knowing will usually depend on inference and circumstantial evidence.'" *United States v. Romero-Reyna*, 867 F.2d 834, 836 (5th Cir. 1989)(citation omitted).

To prove that a defendant aided and abetted in the distribution of illegal drugs (see court's instruction at 3 R. 392-93), the government had to prove that he associated with a criminal venture and participated in it, and sought by his actions to make that venture succeed. *United States v. Pedroza*, 78 F.3d 179, 183 (5th Cir. 1996). "To associate" means to share in the criminal intent of the principal; "to

Case 1:00-cv-00171  Document 5  Filed in TXSD on 01/04/2001  Page 48 of 67

participate" means to engage in some affirmative conduct designed to aid the

venture. *Id.*, at 183-84.

It is undisputed that the authorities found 269 pounds of marijuana concealed

in the fuel tank of the black Freightliner tractor Mortimer was driving when arrested

at the Falfurrias checkpoint on August 11, 1998 (2 R. 161, 172, 192-93, 199-200,

203, 256). Mortimer contends, however, that he did not know of the conspiracy or

that the marijuana had been secreted in the tractor's fuel tank. This Court has

observed the following regarding hidden compartment cases:

> As a general rule, a jury may infer knowledge of the presence of
> drugs from the exercise of control of a vehicle containing such
> contraband. When the drugs are secreted in hidden compartments,
> however, 'this Court has normally required additional "circumstantial
> evidence that is suspicious in nature or demonstrates guilty
> knowledge." This requirements stems from our recognition that, in
> hidden compartment cases, there 'is at least a fair assumption that a
> third party might have concealed the controlled substances in the
> vehicle with the intent to use the unwitting defendant as the carrier in
> a smuggling enterprise.'

*United States v. Ortega Reyna*, 148 F.3d 540, 544 (5th Cir. 1998).

*See also, United States v. Ramos-Garcia*, 184 F.3d 463, 465-66 (5th Cir. 1999). The

evidence in the instant case showed that Mortimer knew the marijuana was

concealed in the fuel tank and that he was not an unwitting courier.

Mortimer was an experienced truck driver who knew it was not profitable to

drive an empty rig (2 R. 38-47). When Dewayne Smith first observed the black

Case 1:00-cv-00171    Document 5    Filed in TXSD on 01/04/2001    Page 49 of 67

Freightliner parked at the truck stop in June 1998, it appeared abandoned (2 R. 49-50, 55). DeWayne  identified Mortimer as the rig's driver in June 1998 (2 R. 63-64). When Mortimer drove the rig through the Falfurrias checkpoint in June 1998, it had no cargo (2 R. 65). According to the logbook seized from the tractor, the trailer had been empty when Mortimer drove it from North Carolina to South Texas on August 8-10, 1998 (2 R. 266-69; GX34). Mortimer had no co-driver on this trip (2 R. 287). The trailer similarly had no cargo when Mortimer was stopped at the Falfurrias checkpoint on August 11, 1998 (2 R. 172). The proper inference the jury could draw from this evidence was not that Mortimer's trips were unprofitable. Rather, the cargo Mortimer hoped to turn into profit was the 269 pounds of marijuana concealed in the fuel tank.

The jury further could infer Mortimer's guilt from his nervous behavior at the checkpoint, his interest in the canine's activity and his inconsistent statements during the course of the scheme. When Mortimer arrived at the checkpoint on August 11, 1998, he drove 15-30 feet past the stop sign. When questioned by the agent he appeared nervous, fidgeted in his seat and moved the gear shift as if in a hurry (2 R. 127-28, 131-33). As Agent Hawley ran the canine around the rig, Mortimer and Andrew from inside the checkpoint station peered through the plate glass window toward the rig, thus demonstrating their interest in whether the canine alerted on the drugs (2 R. 146).

Before the marijuana was found, Mortimer told Border Patrol Agent Blair he was from Florida, had driven to McAllen to pick up a load, but had learned that the refrigeration unit needed repair. He claimed that the repairs were too expensive in the Valley and he was en route to Houston to have them completed (2 R. 145-46, 164). However, after the marijuana was found, Mortimer told Customs Agent Ybarra that he was from North Carolina, he had unsuccessfully tried to get a load of mangoes at the Silver Spur Truck Stop, had become angry, and had decided to return to North Carolina empty. Mortimer further claimed that a man whose name he did not know had traveled with him and Andrew from North Carolina, had borrowed the rig on the night of August 10, 1998, and had returned the keys either later that evening or the next morning (2 R. 251-55). Although Mortimer told Ybarra this was his first trip to South Texas, W&B Refrigeration employee testified that Mortimer had repairs made to the trailer on July 22, 1998 (2 R. 206-10, 213, 252). When Mortimer had the unit recharged with freon on August 10, 1998, he told the W&B employee he would return the next day for more repairs unless he obtained a load (2 R. 214). The jury could infer Mortimer's knowledge of the marijuana from his inconsistent statements.

The jury could further could infer that Mortimer left the tractor with the trailer at W&B on August 10, 1998, to distance himself from the tractor. (2R. 71-73). According to Agent Ybarra, someone with special skill designed the fuel tank's

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 51 of 67

hidden compartment as it was necessary to remove the gas vapors from the tank to complete the welding process (2 R. 275-76). An Ace Hardware bag containing nuts, bolts and washers similar to those used to connect the retaining band to the fuel tank were found inside the tractor (2 R. 233-36, 239-40). The cellular phones seized from the tractor were further evidence of the drug conspiracy. *See, e.g., United States v. Iriarte-Ortega*, 113 F.3d 1022, 1025 n.4 (9th Cir. 1997).

The logbook seized from the tractor indicated Mortimer, without a co-driver, was the rig's driver (2 R. 266-69, 287). Fuel receipts showed that Mortimer generally purchased gasoline in amounts of 150 gallons or less between August 8-9, 1998, paying cash each time (2 R. 87-88, 265; GX25-27). Around 8:00 p.m., on August 11, 1998, before entering the Falfurrias checkpoint, Andrew had filled the driver's side tank of the tractor but not the passenger's side tank where the marijuana was concealed (2 R. 86, 90). Mortimer and Andrew thus knew to fill only one of the gas tanks. As truck drivers are generally "fuel conscious" (2 R. 176-77), the jury properly inferred that Mortimer knew to fill only one gas tank because the other gas tank contained the hidden compartment.

Finally, based on Mortimer's own statements to the authorities, he was en route either to Houston or North Carolina when the marijuana was found at the Falfurrias checkpoint. The most direct route to either destination from the Best Western located between Harlingen and La Feria on Highway 83 west was not north

CitiPDF - www.fesio.com

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 52 of 67

on Highway 281 through the Falfurrias checkpoint, but northeast on Highway 77

through the Sarita checkpoint. Mortimer drove to the Silver Spur Truck Stop located

off Highway 281 near McAllen ostensibly to obtain a load.  However, DeWayne

observed his activity all day at the Silver Spur and testified that he did not leave the

Silver Spur even after the brokerage office closed at 5:00 p.m. (2 R. 244, 246).  The

jury thus could infer that Mortimer went to the Silver Spur to await the "go-ahead"

page and phone call advising him to leave with the marijuana.  The jury could

properly conclude that Mortimer traveled to the Falfurrias checkpoint rather than the

Sarita checkpoint because that had been his successful route in June 1998 (2 R. 64-

66).

The jury thus properly found that Mortimer knew of the concealed marijuana

based on: his inconsistent statements; he drove the truck and filled only one gas tank

while traveling from North Carolina to South Texas; the presence of the nuts, bolts

and washers inside the tractor; his nervousness and interest in the canine search at

the checkpoint; the empty trailer both en route to South Texas and on the return trip

to North Carolina; Mortimer's false denial that the August 11, 1998, incident was

his first trip to South Texas; and his improbable story that an unknown third man

had traveled with him from North Carolina to Texas.

The 269 pounds of marijuana seized from the tractor's fuel tank were valued

at $215,200 (2 R. 274-75).  Mortimer's intent to distribute the marijuana can be

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 53 of 67

inferred from the drugs' amount and value. *See United States v. Suarez*, 155 F.3d 521, 524 (5th Cir. 1998)("Intent to distribute is typically inferred from the fact that an amount is too large for any purpose other than distribution")(quoting *United States v. Sanchez*, 961 F.2d 1169, 1178 (5th Cir. 1992)); *United States v. Caballero*, 712 F.2d 126, 131 (5th Cir. 1983) (jury may infer intent to distribute from price of drugs). Evidence of Mortimer's 1992 Florida drug conviction also was probative of his intent to commit the drug crimes charged. And, as courts have recognized, drug dealers generally do not suffer the presence of innocent bystanders during a drug transaction. *See United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1374 (11th Cir. 1994); *United States v. Martinez-Moncivais*, 14 F.3d 1030, 1034 (5th Cir. 1994).

The government thus proved by direct and circumstantial evidence that Mortimer conspired with Earl Ashman, the unknown travel companion, the person who built the secret compartment, and others unknown to violate the drug laws. The government further proved that Mortimer, the driver of the tractor trailer rig, possessed the 269 pounds of marijuana with the intent to distribute it. By driving to Texas to pick up the marijuana and transport it to North Carolina, Mortimer shared in the criminal intent to commit the crime and sought by his actions to make the illegal venture succeed.

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 54 of 67

When Mortimer took the witness stand in his own defense he put his

credibility in issue. *United States v. Farias-Farias*, 925 F.2d 805, 809 (5th Cir.

1991); *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995). Mortimer's

testimony was riddled with inconsistencies. For example, Mortimer reiterated his

claim about the unknown traveling companion who allegedly borrowed the tractor

trailer rig on the evening of August 10, 1998, embellishing that the man had said he

had an emergency and had to leave on a plane (3 R. 326). Mortimer initially could

not remember the man's name's but then referred to him as "Johnie" (3 R. 310, 312-

14, 326). Mortimer, who claimed to be afflicted with "sleep adnausea", denied

driving the truck from North Carolina to South Texas (3 R. 314-15, 320), when the

trailer's logbook showed his signature as driver with no co-driver (2 R. 287; GX21).

According to Mortimer, Earl Ashman asked him to accompany his driver to South

Texas because the driver did not know his directions and was not good with the

truck. Mortimer, however, testified he had "sleep adnausea" and had never been

to South Texas (3 R. 337-38). Although Mortimer claimed that "Johnie" before

leaving had given him $500 on August 11, 1998, Mortimer had $28 in his wallet

when arrested (3 R. 350-51). The jury as fact finder was free to disbelieve

Mortimer's testimony in whole or in part. *United States v. Garza*, 990 F.2d 171,

175 (5th Cir. 1993)("the jury is the ultimate arbiter of witnesses' credibility and is

free to choose among reasonable constructions of evidence"). Mortimer's

convictions should be affirmed as based on sufficient evidence.

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 56 of 67

# CONCLUSION

For these reasons the judgment of the district court should be affirmed in its

entirety.

Respectfully submitted,

MERVYN M. MOSBACKER
United States Attorney

PAULA C. OFFENHAUSER
Assistant United States Attorney

ALICE ANN BURNS
Assistant United States Attorney
910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77002
(713) 567-9102

ATTORNEYS FOR APPELLEE

38

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 57 of 67

# CERTIFICATE OF SERVICE

I, Alice Ann Burns, Assistant United States Attorney, certify that a copy of

this brief has been served by placing it in the United States mail, postage prepaid,

on October 8, 1999, addressed to:

> Rene Gomez
> 225 Industrial Drive
> Brownsville, Texas 78521
>
> Attorney for appellant Mortimer

                                        _____
                                        ALICE ANN BURNS
                                        Assistant United States Attorney

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 58 of 67

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

1. Exclusive of the exempted portions in 5th Cir. R.32.27(b)(3), the brief contains 9103 words in proportionally spaced typeface.

2. The brief has been prepared in proportionally spaced typeface using CG Times 14 point font for text and 12 point for footnotes produced by Corel WordPerfect 8.0 software.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the court's striking the brief and imposing sanctions against the person signing the brief.

ALICE ANN BURNS
Assistant United States Attorney

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 59 of 67

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

CHARLES R. FULBRUGE III
CLERK

00 JAN -7 PM 2:10

TEL. 504-589-6514
600 CAMP STREET
NEW ORLEANS, LA 70130

January 4, 2000

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW
Regarding: Fifth Circuit Statement on Petitions for Rehearing or
Rehearing En Banc

No. 99-40257 USA v. Mortimer
USDC No. B-98-CR-466

--------------------------------------------------

Enclosed is a copy of the court's decision, and judgment has been
entered under FED. R. APP. P. 36. (However, the opinion may yet contain
typographical or printing errors which are subject to correction.)

FED. R. APP. P.'s 39 through 41, and 5TH CIR. RULES 35, 39, and 41 govern
costs, rehearings, and mandates. New 5TH CIR. RULES 35.2.10 and 40
require that a copy of the opinion or order sought to be reviewed
shall be bound with the petition for rehearing or suggestion for
rehearing en banc as an appendix but shall not be marked or
annotated. Please read carefully the Internal Operating Procedures
(IOP's) following FED. R. APP. P. 40 and 5TH CIR. R. 35 for a discussion o
when a rehearing may be appropriate, the legal standards applied and
sanctions which may be imposed if a nonmeritorious suggestion for
en banc is made.

<u>Direct Criminal Appeals</u>. 5TH CIR. R. 41 provides that a motion for a
stay of mandate under FED. R. APP. P. 41 shall not be granted simply
upon request. The petition must set forth good cause for a stay or
clearly demonstrate a substantial question is to be presented to the
Supreme Court. Otherwise, the motion may be denied and the mandate
issued immediately.

<u>Pro Se Cases</u>. If you were unsuccessful in the district court and/or
on appeal, and will be considering filing a petition for <u>certiorari</u>
in the United States Supreme Court, you do not need to file a motion
for stay of mandate under FED. R. APP. P. 41. The issuance of the
mandate does not affect the time, or your right, to file such a
petition.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: *Joseph Armato*

Joseph Armato, Deputy Clerk

Enclosure
Ms Paula Camille Offenhauser
Ms Alice Ann Burns
Mr Rene Gomez

*Appendix B*

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 60 of 67

U.S. COURT OF APPE
# FILED

JAN 0 4 2000

CHARLES R. FULBRU
Cl

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

------

No. 99-40257
Summary Calendar

------

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN EDWARD MORTIMER,

Defendant-Appellant.

------

Appeal from the United States District Court
for the Southern District of Texas
USDC No. B-98-CR-466-1

------

Before GARWOOD, BARKSDALE and DENNIS, Circuit Judges.

PER CURIAM:*

John Edward Mortimer (Mortimer) was convicted by a jury of
possession of marihuana with intent to distribute, as well as
conspiracy to possess with intent to distribute, in violation of 21
U.S.C. §§ 841(a)(1) and 846. He was sentenced to concurrent terms
of 80 years, followed by four years supervised release, and no

------

* Pursuant to 5TH CIR. R. 47.5 the Court has determined that this
opinion should not be published and is not precedent except under
the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 61 of 67

fine, on each count. Mortimer now appeals his convictions, arguing that he is entitled to a judgment of acquittal, or alternatively, that there was insufficient evidence to support a conviction on either count. We affirm.

This prosecution resulted from an August, 1998, search at the Border Patrol checkpoint near Falfurrias, Texas. Border Patrol agents found approximately 269 pounds of marihuana in a concealed compartment in one of the large fuel tanks of the tractor-trailer rig which Mortimer was driving. The tank had been elaborately modified to store narcotics and signs of welding were visible on the exterior. The marihuana was valued at $215,200.00. Mortimer was accompanied by Andrew Smith, who was not prosecuted, possibly due to insufficient evidence.

Mortimer first contends that the district court erred by denying his Fed. R. Crim. P. 29 motion for a judgment of acquittal. Although Mortimer moved for a judgment of acquittal after the Government rested its case, he failed to renew the motion after he presented his case and the evidence was closed. He also did not renew his motion after the jury returned its verdict, as authorized by Rule 29(c). "Where a defendant fails to renew his [Rule 29] motion at the close of all the evidence, after defense evidence has been presented, he waives his objection to the earlier denial of his motion." *United States v. Daniel*, 957 F.2d 162, 164 (5th Cir. 1992). Accordingly, Mortimer has waived his right to complain of

2

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 62 of 67

the denial of his Rule 29 motion.

Mortimer's second major argument is that the evidence presented to the jury was insufficient to establish his guilt beyond a reasonable doubt on either count.  Regarding the possession count, he asserts that the evidence was insufficient to prove that he knew there was marihuana concealed in the fuel tank. Mortimer's "failure to argue the correct standard of review on appeal does not . . . prevent [this Court] from measuring the argument against the appropriate standard of review."  *United States v. Pierre*, 958 F.2d 1304, 1311 n.1 (5th Cir. 1992) (en bank).

Because Mortimer failed to renew his Rule 29 motion, this Court reviews the sufficiency-of-evidence issue under the plain-error standard.  *United States v. Parker*, 133 F.3d 322, 328 (5th Cir.), *cert. denied*, 118 S.Ct. 1851 (1988).  "A conviction may be reversed under [this] standard only to avoid a manifest miscarriage of justice."  *Id.*  "Such a miscarriage would exist only if the record is 'devoid of evidence pointing to guilt,' or . . . 'because the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'"  *Pierre*, 958 F.2d at 1310 (citations and quotation marks omitted).

"A conviction for the offense of possession of marijuana with intent to distribute requires proof that the defendant (1) knowingly (2) possessed marijuana (3) with intent to distribute

3

Case 1:00-cv-00171  Document 5  Filed in TXSD on 01/04/2001  Page 63 of 67

it." *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). "In the nature of things, proof that possession of contraband is knowing will usually depend on inference and circumstantial evidence." *United States v. Richardson*, 848 F.2d 509, 514 (5th Cir. 1988). Furthermore, "*knowledge* of the presence of the contraband may ordinarily be inferred from the exercise of control over the vehicle in which it is concealed." *Id.* at 513. When drugs are hidden in a vehicle, however, such knowledge usually can be inferred only "if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge." *United States v. Garza*, 990 F.2d 171, 174 (5th Cir. 1993), (quoting *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990)).

Trial evidence that supports the jury's finding that Mortimer knowingly possessed the marihuana includes his nervousness at the checkpoint; his inconsistent statements to agents at the checkpoint, which also differed from some of his trial testimony; the evidence that he filled only one fuel tank while driving the rig from North Carolina to Texas, which required him to refuel twice as often as he would have had he filled both tanks at once; the fact that his trailer was always empty when Mortimer had the rig in southern Texas; the visible welding of the fuel tank to accomodate its use as a secret compartment; Mortimer having had possession of the truck since at least June 1998 and having driven

4

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 64 of 67

it great distances since then; and Mortimer's untruthful testimony that he had not traveled to southern Texas in June, 1998. Also probative is Mortimer's improbable attempt to place the blame on a third person purportedly known to him only as "Johnie." *See United States v. Ortega-Reyna*, 148 F.3d 540, 544 (5th Cir. 1998) (listing circumstantial evidence that this Court has recognized as suggestive of guilty knowledge of the presence of drugs, including nervousness, obvious or remarkable alterations to the vehicle, inconsistent statements, and implausible explanations). From the marihuana's large quantity and value, the jury could infer that Mortimer knowingly intended to distribute it. *See United States v. Suarez*, 155 F.3d 521, 524 (5th Cir. 1998).

Mortimer also contests the sufficiency of the evidence supporting his conspiracy conviction. Specifically, he argues that the government failed to prove that he knew of or participated in the alleged drug conspiracy, or that such a conspiracy existed. "To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt (1) an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate voluntarily in the conspiracy." *United States v. Inocencio*, 40 F.3d 716, 725 (5th Cir. 1994). A jury may infer any element of this offense from circumstantial evidence. *United States v.*

5

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 65 of 67

*Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989). Moreover, a jury "may find knowledgeable, voluntary participation from presence [at the scene of criminal activity] when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." *United States v. Paul*, 142 F.3d 836, 840 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 271 (1998), 119 S.Ct. 2379 (1999).

An examination of the record reveals ample evidence to support Mortimer's conspiracy conviction, and is more than adequate to show that he was not acting alone. Mortimer testified that the owner of the rig recruited him to make the August trip to Texas with Johnie, who allegedly drove the rig and was entrusted with the expense money for the trip. The owner of the truck also coordinated the repairs to the rig, and the jury was entitled to infer that it would have been virtually impossible for the owner not to have known about the secret compartment. In addition, a government witness testified that he had seen Mortimer driving the same rig in south Texas in June, 1998. Also, there was evidence that creation of the hidden compartment was likely the work of more than one person. Therefore, Mortimer's knowing possession of the marihuana, as well as his own testimony and other inculpatory evidence, clearly supports the jury's finding that he conspired with one or more others to possess the marihuana with the intent to distribute it. "[A] jury may choose to believe part of what a witness says

6

Case 1:00-cv-00171   Document 5   Filed in TXSD on 01/04/2001   Page 66 of 67

without believing all of that witness's testimony." *United States v. Merida*, 765 F.2d 1205, 1220 (5th Cir. 1985).

In light of the trial evidence, the affirmance of Mortimer's convictions does not constitute a miscarriage of justice (and, indeed, appears amply sufficient under any standard). *See Parker*, 133 F.3d at 328.

AFFIRMED.

**From:**        LaTonya K. Payne
**To:**          atxsb01.po.bbarrera
**Date:**        1/4/01 2:49pm
**Subject:**     Need 2255 Motion File

Berta,

Please file the attached 2255 motion  today Jan 4, 2000 in the Brownsville District Court.  Have an AUSA sign for Mr. Turner. We will serve the defendant from here.  There are two attachments: the Fifth Circut brief (Appendix A) and the Opinion (Appendix B).  We will fax the copies to Brownsville.

Thank You

Latonya Payne

**CC:**          jturner