*17*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 2 5 2001

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | C.R. NO. B-98-466 |
| | § | |
| JOHN EDWARD MORTIMER, | § | |
| Petitioner. | § | |
| (C.A. NO. B-00-171) | § | |

## RESPONSE TO MEMORANDUM AND SUPPLEMENTAL MOTION FOR RELIEF UNDER 28 U.S.C. § 2255

TO THE HONORABLE JUDGE OF SAID COURT:

The UNITED STATES OF AMERICA ("the government") files this response to John Edward Mortimer's ("Mortimer's") Motion For Relief Under 28 U.S.C. § 2255. In support thereof, the government would show the court the following:

I.

### JURISDICTION

Mortimer seeks relief from the judgment of conviction and sentence entered by this court on March 1, 1999 (DOC 54). Mortimer was indicted on September 1, 1998 (DOC 1) and charged with conspiracy to possess with intent to distribute more than 100 kilograms of marijuana and possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1). On Mortimer's plea of not guilty, the case proceeded to trial before a jury beginning November 9, 1998 (DOC 22). The evidence closed on November 20, 1998 (DOC 35). On November 23, 1998, after due deliberation, the jury returned its verdict: Mortimer was found guilty of the offenses alleged in the indictment (DOC 41-43). Mortimer perfected an appeal to the United

States Court of Appeals for the Fifth Circuit (DOC 53), Case No. 99-40257. The court of appeals affirmed the judgment of conviction in an unpublished opinion issued on January 4, 2000 (DOC 62). A true and correct copy of that opinion is attached hereto as Appendix A. Mortimer timely filed the instant motion for relief under 28 U.S.C. § 2255 on October 30, 2000 (DOC 66). Jurisdiction is thus vested in this court under 28 U.S.C. § 2255.

The facts underlying the judgment of conviction to the extent they are germane to the issues presented herein are set forth in full in the government's brief to the Fifth Circuit. A copy of that brief is attached hereto as Appendix B.

II

GROUNDS FOR RELIEF/ISSUES PRESENTED

In his Memorandum of Law in Support of his Motion for Relief Under 28 U.S.C. § 2255, Mortimer raises the following issues:

A.     Whether his conviction was secured in abrogation of his right to the effective assistance of counsel in light of counsel's failure to secure an instruction in accord with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000), during a trial that took place almost two years before *Apprendi* was issued;

B.     Whether counsel's failure to renew Mortimer's motion for a judgment of acquittal inured to Mortimer's detriment thereby denying him a fair trial; and

C.     Whether counsel's failure to move for a suppression of the contraband constitutes a deficient performance that so prejudiced Mortimer that he was denied his right to a fair trial.

III

MOTION TO DISMISS AND AUTHORITIES

A.     The inapplicability of *Apprendi*

In the memorandum of law in support of his motion for § 2255 relief, Mortimer invokes the

2

Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000), and

complains that his attorney failed to exercise sufficient prescience and thus failed to secure a jury

instruction touching upon the amount of contraband involved in the offense. Not only is *Apprendi*

inapplicable to a case that was tried almost two years before the opinion issued, the weight of

authority holds that it is not retroactive for cases pending on collateral review.

Although the United States Court of Appeals for the Fifth Circuit has yet to address the issue,

the courts of appeals that have, and the lion's share of the district courts that have, hold that

*Apprendi* is not retroactive to cases on collateral review. *United States v. Moss*, _ F.3d _, 2001

WL637312 (8th Cir. June 11, 2001); *United States v. Sanders*, 247 F.3d 139, 147-48 (4th Cir. 2001)

(citing *Jones v. Smith*, 231 F.3d 1227 (9th Cir. 2000)). In *Sanders*, the Fourth Circuit proceeded from

the premise that *Apprendi* could only be deemed retroactive if it fell within the second exception of

*Teague v. Lane*, 489 U.S. 288 (1989), that is, whether the new rule is such that without it "the

likelihood of an accurate conviction is seriously diminished." *Sanders*, 247 F.3d at 148. The court

observed, "Improving the accuracy of the trial, however, is not sufficient. Rather, a 'rule that

qualifies under this exception must not only improve the accuracy, but also alter our understanding

of *the bedrock procedural elements* essential to the fairness of a proceeding." *Id.* (quoting *Sawyer

v. Smith*, 497 U.S. 227, 242 (1990)). Although the effect of *Apprendi* is dual faceted - it requires that

a jury determine facts supporting a statutory sentencing enhancement and that this finding be made

beyond a reasonable doubt, rather than by a preponderance of the evidence - these are not the type

of "watershed rules implicating fundamental fairness that require retroactive application on collateral

attack." *Ibid.* Merely shifting fact-finding duties does not fall within the scope of the second

*Teague*-exception. Indicative of the fact that *Apprendi* does not rise "to the level of a watershed

change in criminal procedure" is the fact that *Apprendi* claims are subject to harmless and plain error review. *Sanders,* 247 F.3d at 150 (citing *United States v. Meshack,* 225 F.3d 556, 575 (5th Cir. 2000)). The Fourth Circuit concluded:

> In short, the new rule announced in *Apprendi* does not rise to the level of a watershed rule of criminal procedure which "alters our understanding of the bedrock elements essential to the fairness of a proceeding. *Sawyer,* 497 U.S. at 242. Because the rule does not apply retroactively on collateral review, Sanders cannot challenge his conviction on the basis of any such error.

*Id. See also, United States v. Foote,* 2001 WL 671465 (N.D. Tex. June 12, 2001) (copy attached); *United States v. Brown,* _ F.Supp.2nd _, 2000 WL1880280 (N.D. Tex. Dec. 28, 2000);*United States v. Levan,* _ F. Supp. 2nd _, 2001 WL 50502 *3 - *6 (E.D. Pa. Jan. 18, 2001); *United States v. Jackson,* _ F.Supp. 2nd _, 2001 WL 228179 *3 (S.D. Al. Feb. 28, 2001); *United States v. Zapata-Rodriguez,* _ F.Supp. 2nd _, 2001 WL 194758 *2 (N. D. Tex. Feb. 22, 2001). With respect to successive motions, the Fifth Circuit has held that *Apprendi* will not support a claim for collateral relief. *In re Tatum,* 233 F.3d 857, 859 (5th Cir. 2000). This court should adopt the analysis of the majority and hold that *Apprendi* is not retroactive.

Since *Apprendi* is not only inapplicable to cases on collateral review, but was not decided at the time of trial, counsel's failure to request a jury instruction on the amount of contraband involved in the offense cannot be deemed unreasonable and deficient. Thus, Mortimer cannot demonstrate that he was denied his right to the effective assistance of counsel on this basis. Accordingly relief on this ground should be summarily denied.

B.    Failure to renew judgment of acquittal

Mortimer complains that counsel's failure to renew his motion for a judgement of acquittal after he had presented the defense's case effectively abrogated his right to the effective assistance

of counsel by enhancing the standard of review of the sufficiency of the evidence on direct appeal. Ineffective assistance of counsel claims are reviewed under the now well-established *Strickland* standard: "Whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064 (1984). To succeed on such a claim, a petitioner must first show that his counsel's performance fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 1064. The reasonableness of counsel's challenged conduct must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct" and the reviewing court "must strongly presume that counsel has exercised reasonable professional conduct." *United States v. Samples*, 897 F.2d 193, 196 (5th Cir. 1990)(citations omitted). Second, the petitioner must show that he was prejudiced by counsel's ineffective assistance. The prejudice prong, however, is more than just an outcome determinative test; it requires the petitioner to demonstrate that the result of the proceeding was fundamentally unfair or unreliable. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 843-44 (1993); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).

The burden falls on the accused to prove a violation of constitutional standards. The focus is on the attorney's impact on the adversarial process; the constitutional standards may be met irrespective of an accused's evaluation. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984). The Fifth Circuit has noted that:

> "prejudice" must be rather appreciable before a new trial is warranted in view of counsel's error. *See, e.g., Lockhart v. Fretwell*, _ U.S. _, 113 S.Ct. 838 (1993)...

*Spriggs v. Collins*, 993 F.2d 85, 88-89 n.4 (5th Cir. 1993);  *Armstead v. Scott*, 37 F.3d 202, 207 (5th Cir. 1994).

The Second Circuit recently rejected a complaint similar to that advanced by Mortimer.  In *United States v. Finley*, 245 F.3d 199 (2nd Cir. 2001), the appellant complained that his right to the effective assistance of counsel was abrogated when counsel failed to renew his motion for a judgment of acquittal after the defendant and one other witness testified .  The Second Circuit observed that even after it had received the evidence proffered by the defense, the district court would not have been required to change its ruling on the original motion for a judgment of acquittal. Further, although Finley's burden on appellate review of the sufficiency of the evidence was increased, the court would not have ruled differently even if the usual, and less burdensome, standard of review applied.  245 F.3d at 204.  *See also*, *United States v. Toms*, 136 F.3d 176, 182 (D.C. Cir. 1998); *United States v. Syverson*, 90 F.3d 227, 233 (7th Cir. 1996); and *United States v. Fruge*, 495 F. 2d 557, 558 (5th Cir. 1974)(defendant not prejudiced by failure to renew motion for judgment of acquittal, where there was sufficient evidence to take the case to the jury).

Mortimer was not prejudiced by counsel's failure to renew his motion for a judgment of acquittal.  There was sufficient evidence to require the district court to submit the case to the jury. Moreover, the court of appeals would not have reached a contrary result:

> In light of the trial evidence, the affirmance or Mortimer's convictions does not constitute a miscarriage of justice (and, indeed, ***appears amply sufficient under any standard***).

*United States v. Mortimer*, Slip opinion No. 99-40257 (5th Cir. Jan. 4, 2000)(unpublished)(citing *United States v. Parker*, 133 F.3d 322, 328 (5th Cir. 1998)).  Mortimer cannot satisfy his burden of demonstrating prejudice stemming from his attorney's avowed deficiency.  Relief on this ground

6

must be denied.

C.     Failure to advance and preserve a Fourth Amendment violation.

"Failure to file a suppression motion does not constitute per se ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 2587-88 (1986). It may be that the failure to raise the suppression issue was a strategic decision. Defense counsel 'is not required automatically to file a suppression motion in every case involving evidence or statements obtained after a search; rather, counsel must use professional discretion in deciding whether there are sufficient grounds for such a motion.'"*United States v. Chavez-Valencia*, 116 F.3d 127, 134 (5th Cir. 1997) (quoting *United States v. Aulet*, 618 F.2d 182, 187-88 (5th Cir.1980). The record reflects that the search in controversy took place in the Border Pontrol checkpoint in Falfurrias, Texas. The search occurred after a drug-detecting canine alert to the undercarriage of Mortimer's truck. When a drug-detecting canine alerts in the near presence of a particular vehicle, that action is sufficient to give rise to probable cause to search that vehicle. *United States v. Dovali-Avila*, 895 F.2d 206, 207 (5th Cir. 1990). Moreover, "the mere alerting of a dog, or, to an even lesser extent, the mere walking of a dog around a particular vehicle does not, in and of itself, constitute a search." *Id.* (citing *United States v. Place*, 472 U.S. 696, 103 S.Ct. 2637 (1983) and *United States v. Lovell*, 849 F.2d 910, 913 (5th Cir. 1988)). *See also, United States v. De La Rosa-Valenzuela*, 993 F. Supp. 466, 470-71 (W.D. Texas 1997). Under the facts in controversy, the agents had probable cause to execute an extensive search of Mortimer's vehicle with or without his consent. Therefore, the search of the vehicle and his detention prior to the search were reasonable. Counsel's failure to file a motion to suppress cannot be deemed unreasonable under the circumstances - the motion would have proved futile. Mortimer's right to the effective assistance of counsel was not abrogated and he cannot show cause

7

justifying collateral relief under the last two grounds presented.

A Section 2255 Motion requires a hearing unless the files, the motion, and the record of the case conclusively show that no relief is appropriate. 28 U.S.C. § 2255 (foll.), Rule 8(a). *United States v. Santora*, 711 F.2d 41 (5th Cir. 1983). The need for an evidentiary hearing depends upon an assessment of the record. If the district court cannot resolve the allegations without examining evidence beyond the record, it must hold a hearing. If the record is adequate to fairly dispose of the allegations, the court need inquire no further. *United States v. Smith*, 915 F.2d 959, 964 (5th Cir. 1990).

Although the allegations of a *pro se* complaint are held to a less stringent standard than the formal pleading drafted by lawyers, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief, the cause will be dismissed. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594 (1972). The instant cause does not merit a hearing.

The government prays that the court enter an order dismissing Mortimer's motion for section 2255 relief.

Respectfully submitted,

GREGORY A. SERRES
United States Attorney

By: _____

JAMES L. TURNER
Assistant United States Attorney
910 Travis Street, #1500
P.O. Box 61129
Houston, Texas 77208
Texas Bar: 29316950
Federal Bar: 1406

## CERTIFICATE OF SERVICE

I, James L. Turner, do hereby certify that a copy of the foregoing Respondent's Answer to

Section 2255 Motion, Motion To Dismiss and Brief has been mailed on this the 25th day of June,

2001, via certified mail, return receipt requested to

Mr. John Edward Mortimer
Reg No. 82407-079-D-2
FPC
Edgefield, SC 29824

JAMES L. TURNER
Assistant United States Attorney

9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
|    Respondent, | § | |
| | § | |
|    vs. | § | C.R. NO. B-98-466 |
| | § | |
| JOHN EDWARD MORTIMER | § | |
|    (C.A. B-00-171) | § | |
| | § | |

## ORDER

It is hereby ORDERED that government's motion to dismiss is granted.

SIGNED this _____ day of _____ 2001.


_____
UNITED STATES DISTRICT JUDGE

# NO. 99-40257

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JOHN EDWARD MORTIMER,
Defendant-Appellant.

On Appeal from the United States District Court
For the Southern District of Texas
Brownsville Division, Criminal No. 98-CR-466

BRIEF OF PLAINTIFF-APPELLEE

MERVYN M. MOSBACKER
United States Attorney

PAULA C. OFFENHAUSER
Chief, Civil Division

ALICE ANN BURNS
Assistant United States Attorney

910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77208
(713) 567-9102

*Appendix A*

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 12 of 64

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument should be denied because (1) the facts and legal arguments are adequately presented in the briefs and record and (2) the decisional process would not be significantly aided by oral argument.  FED. R. APP. P. 34(A)(3).

i

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Course of proceedings and disposition below . . . . . . . . . . . 3

     B.   Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     I.   MORTIMER'S DRUG CONVICTIONS WERE BASED ON
         SUFFICIENT EVIDENCE. . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

**Cases**
  **Page**

*Glasser v. United States*, 315 U.S. 60,
    62 S. Ct.. 457, (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Jackson v. Virginia*, 443 U.S. 307,
    319, 99 S. Ct. 2781 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Bailey*, 111 F.3d 1229
    (5th Cir.), cert. denied, 118 S. Ct. 327 (1997) . . . . . . . . . . . . . . . 27

*United States v. Baptista-Rodriguez*, 17 F.3d 1354
    (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Bradfield*, 113 F.3d 515
    (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Brown*, 53 F.3d 312
    (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Caballero*, 712 F.2d 126
    (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Cardenas*, 9 F.3d 1139
    (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Carillo-Morales*, 27 F.3d 1054
    (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Dean*, 59 F.3d 1479
    (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Elam*, 678 F.2d 1234
    (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Farias*, 77 F.3d 391
    (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Farias-Farias*, 925 F.2d 805
    (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Garrison*, 963 F.2d 1462
    (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Garza*, 990 F.2d 171
    (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Inocencio*, 40 F.3d 716
    (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Iriarte-Ortega*, 113 F.3d 1022
    (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Lopez*, 74 F.3d 575
    (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Martinez-Moncivais*, 14 F.3d 1030,
    1034 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Ojebode*, 957 F.2d 1218
    (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Ortega Reyna*, 148 F.3d 540
    (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Parrish*, 736 F.2d 152
    (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Pedroza*, 78 F.3d 179
    (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Posner*, 868 F.2d 720
    (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Pruneda-Gonzalez*, 953 F.2d 190
    (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Case 1:00-cv-00171 Document 17 Filed in TXSD on 06/25/2001 Page 16 of 64

*United States v. Quiroz-Hernandez*, 48 F.3d 858
    (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Ramos-Garcia*, 184 F.3d 463
    (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Resio-Trejo*, 45 F.3d 907
    (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Romero-Reyna*, 867 F.2d 834
    (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Suarez*, 155 F.3d 521
    (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## RULES AND STATUTES

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

21 U.S.C. § 841(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. App. P. 34(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 17 of 64

## NO. 99-40257

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

## UNITED STATES OF AMERICA,
### Plaintiff-Appellee,

### vs.

## JOHN EDWARD MORTIMER,
### Defendant-Appellant.

---

## On Appeal From the United States District Court
## For the Southern District of Texas
## Houston Division, Criminal No. 90-272-1

---

## BRIEF OF PLAINTIFF-APPELLEE

---

The United States of America, Plaintiff-Appellee ("the government"), by the

United States Attorney for the Southern District of Texas, files this brief in response

to that of Defendant-Appellant ("Mortimer").

CVAPDF - www.fasiio.com

Case 1:00-cv-00171  Document 17  Filed in TXSD on 06/25/2001  Page 18 of 64

# STATEMENT OF JURISDICTION

The jury returned its guilty verdict on November 23, 1998 (1 R. 33). Mortimer was sentenced on February 18, 1999 (1 R. 25).[1] On February 25, 1999, Mortimer filed a notice of appeal (1 R. 17-18), and a motion for new trial challenging the sufficiency of the evidence and error in the admission of evidence (1 R. 19-22). The judgment of conviction was entered by the district court (Tagle, J.) on March 1, 1999 (1 R. 11-16). On June 1, 1999, the district court denied Mortimer's motion for new trial as untimely filed (1 R. 1). The district court's jurisdiction was invoked pursuant to 18 U.S.C. § 3231. This Court's jurisdiction was invoked pursuant to 28 U.S.C. § 1291. See, Fed.R.App.P. 4(b)(2), (3). *Cf., United States v. Garrison*, 963 F.2d 1462, 1463-67 (11th Cir. 1992)(filing of notice of appeal before disposition of timely new trial motion in a criminal case).

# STATEMENT OF THE ISSUE

Whether the evidence was sufficient to support Mortimer's conviction for conspiracy to possess with intent to distribute a quantity exceeding 100 kilograms of marijuana, in violation of 21 U.S.C. § 846 (Count 1); and aiding and abetting in the possession with intent to distribute a quantity exceeding 100 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2 (Count 2).

---

[1] "R" refers to the record on appeal. "GX" refers to government exhibit.

CutePDF - www.fasisi.com

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 19 of 64

# STATEMENT OF THE CASE

A.    Course of proceedings and disposition below.

On September 1, 1998, a grand jury in the Southern District of Texas, Brownsville Division, Criminal Action No. B-98-466-1, charged Mortimer with conspiracy to possess with intent to distribute a quantity exceeding 100 kilograms of marijuana, in violation of 21 U.S.C. § 846 (Count 1); and aiding and abetting in the possession with intent to distribute a quantity exceeding 100 kilograms, that is, approximately 122.2 kilograms (269 pounds), gross weight, of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2 (Count 2)(1 R. 190-91).  Mortimer proceeded to trial.  On November 23, 1998, the jury found Mortimer guilty of the two counts charged in the indictment (1 R. 33).  On February 18, 1999, the district court sentenced Mortimer to concurrent terms of 80 months as to the two counts of conviction, to be followed by four years of supervised release, and ordered that he pay special assessments totaling $200 (1 R. 11-16).

B.    Statement of the Facts.

In 1991, DeWayne Smith, an independent truck driver since 1981, began working for the United States Customs Service as an occasional informant.  His commercial truck driving experience included driving refrigerated and non-refrigerated 18-wheel tractor-trailer rigs.  Based on his experience, DeWayne knew

CSMPDF - www.fasta.com

that an idle tractor-trailer rig with no cargo is not profitable to the driver. Truck drivers generally are paid by the load's weight and destination (2 R. 38-45).

The trucking industry is regulated by the Interstate Commerce Commission. Drivers are required to file with the ICC quarterly reports indicating number of miles traveled, hours worked per week, routes and destination (2 R. 93, 96). A driver may drive 10 hours per day. He then is required to be "off" 10 hours unless he has a co-driver (2 R. 94). Most truck drivers sleep in the "sleeper" area of the tractor (2 R. 94-95). A truck driver maintains a daily logbook in which he records hours on duty (driving), hours on duty not driving (e.g., waiting for a load, trailer repair, stopping for gas), hours off-duty (e.g., out of the truck on vacation), hours driving, hours sleeping, and miles driven in each state. The original logbook entries are forwarded to the ICC. The driver retains a carbon copy (2 R. 95-102; see e.g., GX21). Truck drivers are required to have a commercial driver's license (2 R. 97).

DeWayne had assisted Customs in 70 cases for which he had been paid approximately $400,000 (2 R. 45-46, 47-48). DeWayne received $8,000 for his assistance in the instant case (2 R. 49). As part of his investigative work, DeWayne generally scouts local areas looking for idle tractor trailer rigs at motels or parking lots. It is suspicious to him if a rig has sat idle for several days as the driver cannot make a profit unless he is hauling cargo (2 R. 46-47).

4

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 21 of 64

In mid-June 1998, DeWayne spotted a black Freightliner with a refrigerated trailer, both bearing Florida license plates, parked in the back row at a truck stop located between Harlingen and Combs, Texas (2 R. 49-50, 66). The truck's passenger side window was open and the truck and trailer were unhooked (2 R. 49-50). DeWayne thought the rig appeared abandoned (2 R. 50). He jotted down the license plate number and the name of the company, Ashman Truck Lines, depicted on the truck's side door. The company name on the door was different from the name depicted on the tractor's sleeper area, KDS Trucking, Coconut Creek, Florida (2 R. 50-55; GX1-7, 38B). The open passenger window aroused DeWayne's suspicion. Since the parking lot was dirt, the dust kicked up by trucks driving in the area allowed dirt to infiltrate the tractor, the driver's "home on wheels" (2 R. 55). DeWayne related this information to Customs agents (2 R. 51).

When DeWayne returned to the truck stop at 8:00 a.m. the next day, the tractor trailer rig was still parked at the lot (2 R. 55). DeWayne noticed dew on the windshield (2 R. 56). DeWayne advised Customs agents of this information and said he planned to make "drive-bys" until he could identify the rig's driver (2 R. 56).

The following morning, DeWayne saw two black males at the truck stop's pay phone (2 R. 56, 66). DeWayne at trial identified Mortimer as one of the men (2 R. 56-57). Mortimer was using the phone while his companion stood nearby reading a truck trailer magazine (2 R. 57). After completing his call, Mortimer and his

companion entered a Ford custom van bearing North Carolina tags (2 R. 58).
Mortimer meanwhile radioed the van's tag number to Customs and told the agent
he planned to follow the van (2 R. 59). Mortimer followed the two occupants of the
van as they 5-6 times traveled south on the Highway 77 frontage road to the
Harlingen cut-off, made a U-turn, and circled back toward the truck stop (2 R. 59-
60). They eventually drove to a motel located on Business Highway 77 in Harlingen
(2 R. 61).

After meeting with U.S. Customs Special Agent Danny Ybarra, DeWayne
returned to the truck stop to continue surveillance on the black Freightliner (2 R. 61-
62). About three hours later, DeWayne telephoned the phone number printed on the
tractor. Posing as a truck stop security officer, DeWayne told the woman who
answered the phone that the truck appeared abandoned (2 R. 62). The woman
replied that she would page the driver (2 R. 63). Forty-five minutes later, the Ford
Custom van arrived at the truck stop carrying Mortimer and two black males (2 R.
63). Mortimer and one of the men walked over to the trailer while the third man in
the van left the truck stop and drove north on the frontage road before pulling over
(2 R. 63). Meanwhile, Mortimer and his companion entered the tractor and drove
the rig to the front of the truck stop (2 R. 63). The van returned to the truck stop
and the two vehicles, the rig and the van, left the area driving south on Highway 77
(2 R. 63-64).

6

CMsPDF - www.fsesw.com

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 23 of 64

Mortimer in the tractor trailer rig turned onto Highway 83 toward McAllen

(2 R. 64).  DeWayne continued to follow Mortimer as he turned onto Highway 281

north and traveled to the Falfurrias checkpoint (2 R. 64).  At the checkpoint the rig

was directed to the secondary inspection station where an agent opened the trailer's

rear doors and observed that the trailer was empty (2 R. 65).  Mortimer and his

companion then left the checkpoint traveling north on Highway 281.  No contraband

was seized from the tractor trailer rig on this occasion (2 R. 66).

Two months later, in August 1998 at approximately 9:30 a.m., DeWayne

spotted the black Freightliner rig parked at a Best Western motel located on

Highway 83 west between Harlingen and La Feria (2 R. 67-68).  DeWayne notified

Customs agents he had spotted the rig and planned to observe its activities (2 R. 68,

242).  At 10:15 a.m., Mortimer, as driver, and another black male entered the rig

(2 R. 68-69).  Mortimer drove to W&B Refrigeration, a transport refrigeration

repair shop located in Harlingen, where he disconnected the trailer from the tractor

and parked them side-by-side (2 R. 69-70, 205-06).  After entering the shop,

Mortimer and his companion left the area in a taxi and returned to the Best Western

motel (2 R. 70).

After following Mortimer to the motel, DeWayne returned to the repair shop

where he met Customs Agent Ybarra.  The two men maintained surveillance on the

repair shop (2 R. 71, 242). Agent Ybarra briefly returned to the Best Western and learned that Mortimer and his companion were staying in Room 137 (2 R. 243).

Around noon, the trailer was backed into the shop's bay area (2 R. 71). The tractor meanwhile remained parked in the shop's lot and was not approached for repairs (2 R. 72). DeWayne found this unusual because Mortimer and his companion could have returned to the motel in the tractor instead of taking a cab (2 R. 71-73). At 6:00 p.m., a W&B mechanic was still working on the black Freightliner trailer (2 R. 73). At 6:15 p.m., Mortimer arrived at the shop via cab (2 R. 73). Mortimer re-hooked the tractor and trailer and returned to the motel (2 R. 73-76, 111-14; GX13-15). DeWayne maintained surveillance on the motel until 10:00 p.m.. During that time he observed a black male walk to the rear of the trailer and then return to his room (2 R. 76).

DeWayne arrived at the motel at 7:00 a.m. the next morning, August 11, 1998 (2 R. 77, 122). At 9:00 a.m., DeWayne observed Mortimer and another male, later identified as Andrew Smith ("Andrew"), a resident alien from the Bahamas, eating breakfast in the restaurant. After breakfast, Mortimer made a call from a pay phone before returning to his room (2 R. 79, 137, 245; GX16[Mortimer's photograph]; GX17[Andrew Smith's photograph]). An hour after breakfast,

8

CMPDF - www.fasisa.com

02/04/0:.  THU 18:18 FAX 7137181389          US ATTORNEY-OPS                                  @016

Mortimer, as driver, and Andrew entered the tractor trailer rig and drove toward McAllen. They stopped at the Silver Spur Truck Stop in Pharr, Texas, located off Highway 281 north where they remained all day (2 R. 79-82). During part of that time, Mortimer and Andrew left the tractor and entered the brokerage offices/snack bar area of the truck stop (2 R. 81-82). DeWayne and Agent Ybarra observed their activities at the truck stop (2 R. 244). The brokerage office closed at 5:00 p.m. but Mortimer and Andrew remained at the truck stop (2 R. 246). Agent Ybarra left the truck stop at 7:00 p.m. (2 R. 246).

At 8:00 p.m., while DeWayne was in the snack bar area with Mortimer and Andrew, he heard Mortimer's pager go off (2 R. 85). After Mortimer made a call from a pay phone, he and Andrew left the snack bar and entered the rig (2 R. 85). Mortimer drove the rig across Highway 281 to a CITGO gas station. While Mortimer made 6-7 calls from a pay phone, Andrew first filled the tractor's gas tank on the driver's side and then the "reefer" with gasoline (2 R. 85-86). No effort was made to fill the gas tank on the tractor's passenger side (2 R. 90).

The tractor of a long-distance rig is equipped with two 150-gallon gas tanks, one on each side of the tractor, for a total capacity of 300 gallons. Gas stations have pumps which permit both tanks to be fueled with only one read-out, in other words,

it is not necessary for the driver to turn the rig around in order to fuel both tanks. The gas tank on the tractor's driver's side is located in an area underneath the exhaust pipe. It is equipped with a spring-loaded latch and fairing that runs inside the tank. The gas tank on the tractor's passenger side is similarly located between the wheels (2 R. 87-88; GX49). The "reefer" is the refrigeration unit of the trailer. The gas tanks on most "reefers" are located on the driver's side and have a 33-gallon capacity. The gasoline powers the refrigeration unit (2 R. 88-89).

After filling the gas tanks, Andrew walked over to Mortimer who hung up the pay phone (2 R. 90). Mortimer and Andrew entered the gas station, then the tractor trailer rig (2 R. 91). DeWayne followed them as Mortimer drove the rig north on Highway 281 30-40 miles to San Manuel north of Edinburg, Texas (2 R. 91-92). Meanwhile, DeWayne had notified Agent Ybarra of the rig's movement (2 R. 246-47).

U.S. Border Patrol Agent Aaron Blair was working the 4:00-8:00 p.m. shift at the Falfurrias checkpoint located 65 miles north of McAllen, Texas (2 R. 121-22). At 9:30 p.m., Blair and other agents at the checkpoint had received information from Agent Ybarra to be on the lookout for a black Freightliner, with Ashman Trucking depicted on the tractor, hauling a white trailer. Ybarra indicated that the vehicle possibly was carrying narcotics (2 R. 123-24, 142, 247). Mortimer driving the black Freightliner and trailer approached the Falfurrias checkpoint at 10:00 p.m.

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 27 of 64

(2 R. 126-27, 136). Mortimer drove 15-30 feet past the stop sign at the checkpoint before stopping (2 R. 127-28).

Agent Blair stepped up to the driver's window and asked Mortimer if he was a U.S. citizen. Mortimer replied yes. Mortimer also told the agent that a passenger, referring to Andrew, was in the sleeper (2 R. 129-30, 138). As Agent Blair questioned Mortimer, he noticed Mortimer fidgeting in his seat, moving the gear shift and acting as if he were in a hurry (2 R. 131-33). Mortimer agreed that Agent Blair could have a closer look at the vehicle and drove to the secondary inspection station 30-40 yards to the right (2 R. 130-31). While Mortimer was driving to the secondary inspection area, Agent Blair flashed his flashlight inside the checkpoint station to alert other agents that he wanted them to "run the dog", that is, run a canine around the vehicle to see if he alerts (2 R. 133-34, 142-43, 185).

Agents Raymond Lee and Jonathon Hawley emerged from the office (2 R. 135). As Agent Hawley walked the canine around the tractor trailer rig (2 R. 135), Agent Lee stood next to Mortimer and Andrew who were seated on a bench by the door to the station (2 R. 144-45). Agent Lee, who is from Miami, Florida, noticed the rig's Florida tags and asked Mortimer if that was where he was from. Mortimer replied he was from Vero Beach, Florida (2 R. 145). Agent Lee next asked Mortimer what he was hauling. Mortimer answered that the truck was empty. He further stated he had traveled to McAllen to pick up a load but had learned that his

11

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 28 of 64

refrigeration unit was broken and too expensive to repair in "the valley". Mortimer

said he was en route to Houston to have the refrigeration unit repaired (2 R. 145-46,

164).

Another agent asked Mortimer and Andrew to come inside the checkpoint

station. Agent Lee escorted them to the station's interview room (2 R. 146). As

Agent Lee left the station, he noticed that Mortimer and Andrew were standing by

the plate glass window and looking out toward the truck (2 R. 146).

As Agent Lee approached the rig, Agent Hawley said he wanted to "run" the

dog again, that there was something curious about the truck (2 R. 147, 185-86). As

the dog walked around the truck's front end at the driver's side, it crawled

underneath and laid down, indicating she had alerted (2 R. 147, 182-83). Agent Lee

examined the driver's side while Agent Hawley examined the passenger's side (2 R.

147). Hawley noticed that when he tapped on the passenger-side gas tank, a portion

of the tank gave a solid sound instead of a normal hollow ring. Agent Hawley

surmised that the tank contained a concealed compartment of contraband (2 R. 187-

88).

Agent Hawley called Agent Lee over to the passenger's side (2 R. 149, 188).

Agent Hawley had removed the fuel cap from the fuel tank and had shined his

flashlight inside the tank. Visible inside the tank was what appeared to be a metal

wall situated three inches inside the tank and equal distance to the tank's sides (2 R.

12

149-51, 191-92). When the agents tapped on the fuel tank (made of aluminum) on the passenger side, part of it responded with a hollow ring while part of it gave a loud thud with no ringing sound. Agent Lee similarly noticed that the driver's side fuel tank when tapped gave a hollow ringing sound (2 R. 151-53). The metal beneath the driver's side fuel tank appeared normal (no new paint, etc.), but the metal on the passenger's side fuel tank was "distorted,", that is, the metal appeared to have been welded (2 R. 153-54).

Two metal bands secured the fuel tanks to the truck's chassis. When Agent Lee used a tool to remove the long bolt and nut that held the bands in place, he noticed that the threads on one of the bolts were clean but the threads on the other bolt were covered in road tar and grime (2 R. 154-55, 165-67, 174; GX45, 50). Agent Lee thought that the clean bolt had been removed recently due to its appearance (2 R. 155). The fuel tank was smudged with oil and hand prints which Lee also thought unusual (2 R. 189, 194). Underneath the band which had been secured with the clean bolt, the agents discovered a piece of rubber which covered a jagged cut into the fuel tank (2 R. 155). It appeared to Agent Lee that this portion of the tank had been cut: "that portion of the tank had been cut off and then they placed another ring of aluminum on the inside and held it in place with screws and that way the bottom portion that would come off would fit right on, kind of like a lid on a pot or something like that" (2 R. 156). Although Agent Lee removed this

. 13

"lid" by tapping it with a hammer, he determined it could easily be removed by hand (2 R. 156, 168-70, 190, 192; GX51). The cap had around it insulation or expansion foam, similar to "Stuff" obtained from Home Depot. Agent Lee surmised that the foam had been there for some time because it was discolored (2 R. 159, 168-69, 170-71). When the lid was removed, Agents Lee and Hawley saw packages of contraband inside the fuel tank (2 R. 156-60, 190; GX9-12[depicting area inside the fuel tank]). An agent cut into the contraband and determined that it was marijuana. Thirty-three bundles, totaling 269 pounds, of marijuana were removed from the fuel tank (2 R. 161, 171-72, 192-93 [see 2 R. 199-200, 203, 256 (stipulation that contraband was marijuana; GX18-20)). Each bundle was tightly packed in a layer of cellophane, a layer of automotive grease (rear end axle grease), another layer of cellophane and another layer of grease (2 R. 172, 190, 258). The marijuana's packaging precluded the identification of fingerprint evidence (3 R. 274). The marijuana was valued at $215,200 (3 R. 274-75). The fuel tank measured 4-5 feet long and 2.5 to 3 feet wide (2 R. 169). Approximately two-thirds to three-fourths of the passenger side fuel tank had been used to store the marijuana (2 R. 170). Agent Ybarra was notified that contraband had been found and he and Customs Agent Mark West proceeded to the Falfurrias checkpoint (2 R. 248).

According to Agent Ybarra, it took special skill to create the fuel tank's secret compartment. This skill involved cutting the tank, welding to seal it completely, and

14

submerging the tank in some kind of liquid to remove gas residue and vapors so the

welding could be accomplished (3 R. 275-76).

Agent Lee found inside the sleeper area of the tractor some nuts and bolts like

the ones he had removed from the metal band and gas tank (2 R. 163, 174-75;

GX37A, 39A). Other items removed from the trailer included pillows, blankets,

luggage, clothing, shoes, a briefcase and cellular phones (2 R. 164, 259-61; GX41,

58). The trailer was empty (2 R. 172; GX8). Agents seized from the tractor

Mortimer's daily logbook and miscellaneous fuel receipts (2 R. 261-62, 263; GX21,

22-28). The gas receipts showed travel between North Carolina and Texas and

generally were in amounts of 150 gallons or less. One receipt showed 157 gallons

of gas (2 R. 265). A W&B Refrigeration Service invoice, a W&B Refrigeration

repair receipt dated August 10, 1998, and cab receipts dated August 10, 1998, were

seized from Mortimer's person (2 R. 262-63; GX30, 31, 42). Mortimer's daily

logbook showed that he left Raleigh, North Carolina, on August 8, 1998, and

traveled with an empty trailer to Atlanta, Georgia, Arkansas and Houston, Texas,

before arriving in Harlingen on August 10, 1994, at 4:00 a.m. (2 R. 266-69; GX21,

34 [time-line]). He had no co-driver (3 R. 287).

Agent Lee knew "from being a mechanic" that truck drivers generally are fuel

conscious and check their fuel daily (2 R. 176-77). If the driver had filled the tanks

before he left the valley, he would not necessarily have known there was a problem

15

(2 R. 177-78). Agent Lee did not examine how the fuel system was set up on the tractor trailer rig (2 R. 177-78). A driver who has operated a tractor trailer rig for several months would be suspicious if he could fill up one of the gas tanks but not the other (2 R. 180).

Other items seized from the tractor included an Ace Hardware bag which contained various nuts, bolts and washers similar to those used to connect the cowling (step-down parts of the tractor). A second bag of similar nuts, bolts and washers, all used in appearance, as well as brackets were found under a blanket in the sleeper area (2 R. 173-74, 233-36, 239-40; GX35, 35A, 36, 36A, 39, 43-46, 50). Photographs depicted the socket area that fit the bolt which held the band that retained the fuel tank onto the chassis (GX35C); a crate which contained a can of black spray paint retrieved from the tractor (GX38, 38A); the nut for the fuel tank's retaining band (GX35B); and nuts, bolts, screws and washers found on a shelf inside the tractor's sleeper area (GX37) (2 R. 232-33, 236-41).

After the marijuana was found, Agent Blair advised Mortimer and Andrew of their constitutional rights while they were seated in the checkpoint station's interview room (2 R. 135, 138, 197, 263; GX32). Mortimer told Agent Blair he did not want to say anything (2 R. 138). He told Agent Hawley he did not want to say anything about the case at that time (2 R. 198).

After Agents Ybarra and West arrived at the checkpoint, Ybarra again read Mortimer his constitutional rights from a card (2 R. 250-51, 263). Mortimer told Ybarra he wished to cooperate (2 R. 251). In response to questioning, Mortimer said he had traveled to the valley from Raleigh, North Carolina, to pick up a load of mangos. He claimed he had tried to obtain a load at the Silver Spur Truck Stop but the brokers had said he needed to wait a couple of days because they could not find a load for him. Mortimer claimed he had become angry and decided to return to North Carolina empty (2 R. 251). When Agent Ybarra told him he had been seen in the valley a month-and-a-half earlier, Mortimer became agitated and upset, saying this was his first trip (2 R. 252-53).

Mortimer denied knowledge of the marijuana (2 R. 253). He claimed that a third man had traveled with him from North Carolina but he did not know the man's name (2 R. 253-54). Mortimer stated that this unknown man had come to his motel room on August 10, 1998, at 10:00 p.m. and asked to borrow the tractor trailer rig to drive to the store. Mortimer said he loaned the man the rig. Mortimer first told Agent Ybarra that the man returned the keys approximately two hours later, but then clarified that the keys were returned the next morning (2 R. 254-55). Mortimer claimed that the unknown man had traveled with him from North Carolina because the company did not trust Mortimer with the money (2 R. 255). Mortimer said Andrew Smith was his best friend and had traveled with him to keep him company

17

CMPDF - www.fasisi.com

(2 R. 255-56). When Agent Ybarra questioned Andrew, Andrew said he thought the unknown man was named "Johnie" (3 R. 279). Agent Ybarra subsequently learned that one David Grant from Raleigh, North Carolina, had stayed at the same Best Western, Room 231, on August 9-11, 1998. Grant had paid for his room with cash (3 R. 283-85; DX1-2).

Records maintained at W&B Refrigeration in Harlingen indicated the following repairs to the trailer refrigeration unit located on the nose of the trailer: on August 10, 1998, the unit's freon was recharged and the battery terminal replaced at a cost of $1,227.26 (GX29-first page); on July 22, 1998, a refrigeration line, suction vibrasorber was replaced at a cost of $183.16 (GX29-second page)(2 R. 206-10). These bills were paid in cash (2 R. 210). No work was performed on the tractor (2 R. 210).

A W&B Refrigeration employee identified Mortimer as the man requesting repairs on the trailer on July 22, 1998, and August 10, 1998 (2 R. 204-09). When Mortimer requested at W&B that the refrigeration unit be repaired on July 22, 1998, he asked that the unit refrigerate (2 R. 213). The unit had a blown suction vibrasorber. When that repair was made, it was determined that the freon needed to be recharged. Due to the cost, Mortimer said he did not have the money to recharge the freon. Mortimer returned on August 10, 1998, to complete the repairs. The freon was recharged and an SV valve was replaced. When the W&B

CtkPDF - www.fania.com

Case 1:00-cv-00171  Document 17  Filed in TXSD on 06/25/2001  Page 35 of 64

technician reported the need for additional repairs to make the unit operate, Mortimer declined, saying that if he did not get a load of cargo that night, he would return the next day to finish the repairs (2 R. 213-14). Mortimer did not return the next day (2 R. 214). It was not necessary for Mortimer to leave the tractor at W&B as the repairs were made to the trailer's refrigeration unit (2 R. 215-16). The yard around W&B is fenced (2 R. 215).

In February 1992, Mortimer was arrested in Medley, Dade County, Florida, on charges involving the seizure of 659 pounds of marijuana. Regarding this incident, Mortimer, accompanied by two persons, arrived at Allied Chemicals in a pickup truck around midnight and had a one-ton chlorine cylinder loaded into the truckbed. This was a controlled delivery as a police officer was working undercover at the plant. Mortimer requested this particular one-ton cylinder by number. Mortimer, driving the truck, was followed by police officers for 30 minutes until he and his companions noticed the police surveillance. Mortimer and his passengers abandoned the truck. The two passengers were captured but Mortimer eluded the police and was arrested two weeks later when he turned himself into the authorities. The marijuana had been concealed inside the cylinder through an opening that had been welded shut. Mortimer was convicted on the drug charges (2 R. 221-31; GX52-57).

CMxPDF - www.fax/as.com

## Defense Case.

Forty-one-year-old John Mortimer, a resident of Hollywood, Florida, testified that he owned a tractor-trailer and made his living hauling storm debris. He denied committing the 1992 Florida drug crime (3 R. 300-03). He claimed that in June 1998, while working in Norcross, Georgia, he had received a telephone call from Earl Ashman. Earl asked him to ride with a driver to Texas and Mortimer agreed.

Mortimer testified that in July, 1998, Earl and the driver, whose last name was Dryer and whose first name started with "E", came to Mortimer's hotel. The three then traveled to North Carolina (3 R. 301, 305-06). Mortimer rode with the driver to Texas to pick up a load of potatoes which was to be transported to New York (3 R. 306). However, the "unit" was not working properly. Mortimer and the driver went to W&B Refrigeration where they learned the repairs would cost $800 (3 R. 306). Mortimer telephoned Earl who told him to get a dry load (3 R. 306). Mortimer testified that "me and Earl picked up the truck from W&B Refrigeration" (3 R. 307). Mortimer subsequently telephoned Earl that he was concerned about the risk involved in personally signing for a loan for the trailer when it was not repaired properly. He asked to return to North Carolina (3 R. 307). En route, the driver got a speeding ticket in Texas and hit a post, damaging the trailer (3 R. 307). After Mortimer arrived in North Carolina, he flew back to Georgia (3 R. 307). The logbooks that belonged to Earl and the driver were left in

20

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 37 of 64

the tractor (3 R. 308). Mortimer denied being in South Texas in June 1998 (3 R.
308).

Around August 1998, Earl again telephoned Mortimer and asked him to
accompany his driver to Texas to pick up a load (3 R. 309). Mortimer agreed, and
flew from Atlanta, Georgia, to Raleigh, North Carolina, arriving on August 7 or 8,
1998 (3 R. 309, 312). After Mortimer checked into a hotel, he paged Earl who told
him to come to another hotel where the truck was parked (3 R. 310, 312). At the
hotel, Mortimer met Earl and "another guy" whose name Mortimer did not recall:
"They call– not Johnie. It was just – oh, boy, what is it? They called him – started
with a D. I can't remember his name. Duane? I can't remember his name offhand"
(3 R. 310).

According to Mortimer, however, some guy other than Earl gave the money
to "Johnie". Mortimer asked what was going on and Earl told him "the other guy
bought the truck or something". Mortimer was concerned because "if anybody else
was on the truck [he] did not want to get involved... " (3 R. 312). Earl told
Mortimer that the tractor trailer had been picked up from the shop, was repaired and
ready to go (3 R. 313). Mortimer testified that when he saw the trailer in North
Carolina, it had a car inside, but they left the car in North Carolina. It can be
inferred that the trailer was empty (3 R. 316-17).

CMsPDF - www.fesisa.com

Two days after his arrival in Raleigh, Mortimer and "Johnie" drove to Atlanta in the rig. "Johnie" drove the truck. Mortimer told the officers who arrested him he thought the driver's name was "John" or "Johnie" or something like that (3 R. 314).

Mortimer and "Johnie" met Andrew in Atlanta. Andrew had flown from Florida to Atlanta to help Mortimer drive the truck although Andrew did not have a commercial driver's license (3 R. 314, 315). Mortimer testified that the doctor told him he has "sleep adnausea" which is like "dropsy sleep", meaning he has a problem with falling asleep (3 R. 314-15). Mortimer, "Johnie", and Andrew then drove from Atlanta to Harlingen. "Johnie" drove from Houston to Harlingen although the logbook showed that Mortimer drove that leg of the trip (3 R. 320). Mortimer rented a room for the three of them but when he told "Johnie" he could not smoke in the room, "Johnie" got his own motel room (Room 231) (3 R. 315-16).

On August 10, 1998, Mortimer and Andrew discovered that the refrigeration unit would not run continuously. Mortimer telephoned Earl who told him, "You got to hook this wire to it and that" (3 R. 317). Mortimer told Earl he did not like going through all the trouble because they had a load to pick up (3 R. 317). Mortimer and Andrew took the tractor and trailer to W&B Refrigeration and learned it would cost $1,700 to "fix the whole thing with mufflers and all kind of stuff he said needed on it" (3 R. 317-18). Mortimer thought this "ridiculous". He telephoned Earl who

Case 1:00-cv-00171  Document 17  Filed in TXSD on 06/25/2001  Page 39 of 64

asked that the trailer be repaired at a cheaper price. Mortimer let them repair what he thought was a reasonable price. Mortimer unhooked the tractor from the trailer and left them both at the repair shop. Earl had asked if the lights on the tractor could be fixed (3 R. 318-19). Mortimer and Andrew then returned to the motel in a taxi (3 R. 319). At 5:30 p.m., Mortimer telephoned W&B and learned that the $1,200 worth of repairs to the trailer had been made but the unit would overheat when turned off and on (3 R. 321-22). Mortimer returned to W&B in a taxi and paid for the repairs (3 R. 322-23).

When Mortimer returned to the motel, he went to sleep (3 R. 324-25). At approximately 8:00 p.m., "Johnie" telephoned Mortimer and said he wanted to go get something to eat. "Johnie" then came to the room and borrowed the rig (3 R. 325). At 7:30 a.m. the next day, "Johnie" came to Mortimer's room and said he had received an emergency phone call and had to leave on a plane (3 R. 326). "Johnie" gave Mortimer $500 for gasoline (3 R. 327). Mortimer paged Earl Ashman but Earl did not telephone him (3 R. 327). Someone had given Mortimer a phone number for "Phillip" who had the load of mangos (3 R. 327). "Phillip" told Mortimer to come to the truck stop. Mortimer and Andrew then went to the truck stop as instructed (3 R. 327-28). "Phillip" contacted them and said he could load the truck the next morning and would give Mortimer $2,800 as travel money to New York (3 R. 328-29).

CNVPDF - www.fasiss.com

Mortimer meanwhile had decided to drive to Houston and obtain the parts for the "unit" because that was where W&B obtained parts (3 R. 318). Mortimer told Phillip he was going to Houston to complete the repairs on the trailer (3 R. 329). Mortimer and Andrew then headed for Houston (3 R. 329). Mortimer denied all knowledge of the marijuana (3 R. 329-30).

On cross-examination, Mortimer testified he had known Earl Ashman for about a year (3 R. 335). When Earl telephoned him about the trip to Texas, he said the driver did not know his directions and was not good with the truck. This was the driver's first time to drive a truck. Mortimer had never been to South Texas but he knew how to read a map (3 R. 337-38). Mortimer had the sleep disorder about two years (3 R. 340). He said that "Dryden" was with him during the July 22, 1998, trip to Texas (3 R. 346-47). According to Mortimer, he was hoping to get another load in Houston so he would not have to return to Harlingen (3 R. 348). Mortimer admitted he paid $90 for gas at the CITGO station and that he had $28 in his wallet when arrested. He claimed that the rest of the $500 "Johnie" had given him for gasoline also was in his wallet (3 R. 350-51). According to Mortimer's bank records, he paid Andrew $777 on July 8, 1998, and $400 on August 8, 1998 (3 R. 353-58). Mortimer produced canceled checks he allegedly cashed on June 17 and 19, 1998, as evidence that he was not in Harlingen, Texas, on those dates (3 R. 362-

65). Mortimer's pastor testified that he was a faithful and honest Christian man (3
R. 367-71).

## SUMMARY OF ARGUMENT

Mortimer's convictions for conspiracy and aiding and abetting in the
possession with intent to distribute marijuana were based on sufficient evidence.
Mortimer was driving the tractor at the Falfurrias checkpoint when 269 pounds of
marijuana worth $215,000 were found concealed in the fuel tank on the tractor's
passenger side. Circumstantial evidence demonstrated Mortimer's guilty knowledge.
Mortimer, an experienced truck driver, knew it was not profitable to drive an empty
rig. Nonetheless, he had an empty trailer when he traveled from North Carolina to
the Harlingen area on August 8-10, 1998, and when arrested on August 11, 1998.
At the checkpoint, Mortimer drove past the stop sign and appeared nervous to the
agent. He also displayed a keen interest in the canine search of the rig.

Before the marijuana was found, Mortimer told the authorities he was en route
to Houston to have repairs completed on the refrigeration unit. After the marijuana
was found, Mortimer told the authorities he had not obtained a load, had become
angry and he had decided to return to North Carolina empty. Mortimer also claimed
that a man whose name he could not remember had traveled with him from North
Carolina and had borrowed the rig. Mortimer further claimed the August 1998 trip
was his first trip to South Texas in contrast to the testimony of the W&B

Refrigeration employee who said Mortimer had the trailer repaired on July 22, 1998. This evidence, along with evidence that Mortimer was the rig's driver, hardware similar to that used on the fuel tank was found in the tractor, fuel receipts showed that only one of the fuel tanks was filled with gasoline during the trip, and that Mortimer went to the Falfurrias checkpoint as he had done in June 1998 rather than the Sarita checkpoint, was properly considered by the jury as evidence of Mortimer's guilty knowledge. Moreover, Mortimer was in possession of 269 pounds of marijuana worth $215,200. Drug dealers generally do not countenance the presence of persons not associated with the illegal scheme.

## ARGUMENT

I.   **MORTIMER'S DRUG CONVICTIONS WERE BASED ON SUFFICIENT EVIDENCE.**

Mortimer has raised two points of error on appeal. He contends that the district court erred in denying his Fed.R.Crim.P. 29(a) motion as to the conspiracy and substantive crimes charged against him. The district court denied Mortimer's Fed.R.Crim.P. 29(a) motion at the close of the government's case-in-chief (3 R. 293-94). Mortimer did not renew his Rule 29(a) motion at the close of his defense case (3 R. 378-79), and did not file a motion for judgment of acquittal within 7 days of the verdict. His insufficiency of the evidence claims must be reviewed for

manifest miscarriage of justice. *United States v. Bailey*, 111 F.3d 1229, 1235 (5th

Cir.), cert. denied, 118 S. Ct.. 327 (1997); *United States v. Elam*, 678 F.2d 1234,

1247 (5th Cir. 1982); *United States v. Farias*, 77 F.3d 391, 394 (11th Cir. 1996).

The government has combined its response to both of Mortimer's appellate issues

in the following discussion.

Generally, appellate courts consider the evidence adduced at trial, whether it

be direct or circumstantial, or both, together with all inferences reasonably drawn

from it in the light most favorable to the prosecution. The Court must determine

whether any rational trier of fact could have found the essential elements beyond a

reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789

(1979); *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct.. 457, 469 (1942);

*United States v. Bradfield*, 113 F.3d 515, 525 n.30 (5th Cir. 1997).

It is "not for the [reviewing appellate court] to weigh the evidence or to

determine the credibility of the witnesses." *Glasser*, 315 U.S., at 80, 62 S. Ct., at

469; *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). It is not necessary

that the evidence exclude every rational hypothesis of innocence or be wholly

inconsistent with every conclusion except guilt, provided a reasonable trier of fact

could find the evidence establishes guilt beyond a reasonable doubt. *United States*

*v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995); *United States v. Pruneda-*

*Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). A jury "is free to choose among

CutePDF - www.tesio.com

Case 1:00-cv-00171  Document 17  Filed in TXSD on 06/25/2001  Page 44 of 64

reasonable constructions of the evidence." *Lopez*, 74 F.3d at 577. Mere presence at the scene of the crime standing alone is insufficient to prove guilt. *Bradfield*, 113 F.3d at 825 n.34; *United States v. Carillo-Morales*, 27 F.3d 1054, 1065 (5th Cir. 1994). Presence is a significant factor to be evaluated within the context of the circumstances under which it occurs. *See United States v. Dean*, 59 F.3d 1479, 1486 (5th Cir. 1995).

To prove conspiracy to possess with intent to distribute a controlled substance, the government was required to prove beyond a reasonable doubt that an agreement existed between two or more persons to violate the narcotics laws, that the defendant knew of the conspiracy and intended to join in it, and that the defendant voluntarily participated in the conspiracy. *United States v. Inocencio*, 40 F.3d 716, 725 (5th Cir. 1994). "No evidence of overt conduct is required; [a] conspiracy agreement may be tacit, and the trier of fact may infer an agreement from circumstantial evidence," including evidence of concert of action between co-conspirators. *Id.* A person does not have to play a major role in the criminal enterprise to sustain a conspiracy conviction, and although mere presence at the scene of the crime is not sufficient by itself to authorize a conviction, the jury may consider that fact together with other evidence of guilt in reaching its verdict. *United States v. Parrish*, 736 F.2d 152, 157 (5th Cir. 1984).

To prove possession with intent to distribute a controlled substance, the government was required to prove beyond a reasonable doubt that the defendant knowingly possessed drugs with the intent to distribute them. *United States v. Quiroz-Hernandez*, 48 F.3d 858, 868 (5th Cir. 1995). Possession may be actual or constructive, *Id.*, and may be proven by circumstantial or direct evidence. *United States v. Ojebode*, 957 F.2d 1218, 1223 (5th Cir. 1992). Constructive possession has been defined as "ownership, dominion or control over the [premises/ conveyance] in which the contraband was concealed." *United States v. Posner*, 868 F.2d 720, 722-23 (5th Cir. 1989). Constructive possession also has been defined as "the knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance." *United States v. Cardenas*, 9 F.3d 1139, 1158 (5th Cir. 1993). "'[P]roof that possession of contraband is knowing will usually depend on inference and circumstantial evidence.'" *United States v. Romero-Reyna*, 867 F.2d 834, 836 (5th Cir. 1989)(citation omitted).

To prove that a defendant aided and abetted in the distribution of illegal drugs (see court's instruction at 3 R. 392-93), the government had to prove that he associated with a criminal venture and participated in it, and sought by his actions to make that venture succeed. *United States v. Pedroza*, 78 F.3d 179, 183 (5th Cir. 1996). "To associate" means to share in the criminal intent of the principal; "to

29

participate" means to engage in some affirmative conduct designed to aid the

venture. *Id.*, at 183-84.

It is undisputed that the authorities found 269 pounds of marijuana concealed

in the fuel tank of the black Freightliner tractor Mortimer was driving when arrested

at the Falfurrias checkpoint on August 11, 1998 (2 R. 161, 172, 192-93, 199-200,

203, 256). Mortimer contends, however, that he did not know of the conspiracy or

that the marijuana had been secreted in the tractor's fuel tank. This Court has

observed the following regarding hidden compartment cases:

> As a general rule, a jury may infer knowledge of the presence of
> drugs from the exercise of control of a vehicle containing such
> contraband. When the drugs are secreted in hidden compartments,
> however, 'this Court has normally required additional "circumstantial
> evidence that is suspicious in nature or demonstrates guilty
> knowledge." This requirements stems from our recognition that, in
> hidden compartment cases, there 'is at least a fair assumption that a
> third party might have concealed the controlled substances in the
> vehicle with the intent to use the unwitting defendant as the carrier in
> a smuggling enterprise.'

*United States v. Ortega-Reyna*, 148 F.3d 540, 544 (5th Cir. 1998).

*See also, United States v. Ramos-Garcia*, 184 F.3d 463, 465-66 (5th Cir. 1999). The

evidence in the instant case showed that Mortimer knew the marijuana was

concealed in the fuel tank and that he was not an unwitting courier.

Mortimer was an experienced truck driver who knew it was not profitable to

drive an empty rig (2 R. 38-47). When Dewayne Smith first observed the black

Case 1:00-cv-00171 Document 17 Filed in TXSD on 06/25/2001 Page 47 of 64

Freightliner parked at the truck stop in June 1998, it appeared abandoned (2 R. 49-50, 55). DeWayne identified Mortimer as the rig's driver in June 1998 (2 R. 63-64). When Mortimer drove the rig through the Falfurrias checkpoint in June 1998, it had no cargo (2 R. 65). According to the logbook seized from the tractor, the trailer had been empty when Mortimer drove it from North Carolina to South Texas on August 8-10, 1998 (2 R. 266-69; GX34). Mortimer had no co-driver on this trip (2 R. 287). The trailer similarly had no cargo when Mortimer was stopped at the Falfurrias checkpoint on August 11, 1998 (2 R. 172). The proper inference the jury could draw from this evidence was not that Mortimer's trips were unprofitable. Rather, the cargo Mortimer hoped to turn into profit was the 269 pounds of marijuana concealed in the fuel tank.

The jury further could infer Mortimer's guilt from his nervous behavior at the checkpoint, his interest in the canine's activity and his inconsistent statements during the course of the scheme. When Mortimer arrived at the checkpoint on August 11, 1998, he drove 15-30 feet past the stop sign. When questioned by the agent he appeared nervous, fidgeted in his seat and moved the gear shift as if in a hurry (2 R. 127-28, 131-33). As Agent Hawley ran the canine around the rig, Mortimer and Andrew from inside the checkpoint station peered through the plate glass window toward the rig, thus demonstrating their interest in whether the canine alerted on the drugs (2 R. 146).

Case 1:00-cv-00171  Document 17  Filed in TXSD on 06/25/2001  Page 48 of 64

Before the marijuana was found, Mortimer told Border Patrol Agent Blair he was from Florida, had driven to McAllen to pick up a load, but had learned that the refrigeration unit needed repair. He claimed that the repairs were too expensive in the Valley and he was en route to Houston to have them completed (2 R. 145-46, 164). However, after the marijuana was found, Mortimer told Customs Agent Ybarra that he was from North Carolina, he had unsuccessfully tried to get a load of mangoes at the Silver Spur Truck Stop, had become angry, and had decided to return to North Carolina empty. Mortimer further claimed that a man whose name he did not know had traveled with him and Andrew from North Carolina, had borrowed the rig on the night of August 10, 1998, and had returned the keys either later that evening or the next morning (2 R. 251-55). Although Mortimer told Ybarra this was his first trip to South Texas, W&B Refrigeration employee testified that Mortimer had repairs made to the trailer on July 22, 1998 (2 R. 206-10, 213, 252). When Mortimer had the unit recharged with freon on August 10, 1998, he told the W&B employee he would return the next day for more repairs unless he obtained a load (2 R. 214). The jury could infer Mortimer's knowledge of the marijuana from his inconsistent statements.

The jury could further could infer that Mortimer left the tractor with the trailer at W&B on August 10, 1998, to distance himself from the tractor. (2 73). According to Agent Ybarra, someone with special skill designed the

hidden compartment as it was necessary to remove the gas vapors from the tank to complete the welding process (2 R. 275-76). An Ace Hardware bag containing nuts, bolts and washers similar to those used to connect the retaining band to the fuel tank were found inside the tractor (2 R. 233-36, 239-40). The cellular phones seized from the tractor were further evidence of the drug conspiracy.  *See, e.g., United States v. Iriarte-Ortega*, 113 F.3d 1022, 1025 n.4 (9th Cir. 1997).

The logbook seized from the tractor indicated Mortimer. without a co-driver, was the rig's driver (2 R. 266-69, 287). Fuel receipts showed that Mortimer generally purchased gasoline in amounts of 150 gallons or less between August 8-9, 1998, paying cash each time (2 R. 87-88, 265; GX25-27). Around 8:00 p.m., on August 11, 1998, before entering the Falfurrias checkpoint, Andrew had filled the driver's side tank of the tractor but not the passenger's side tank where the marijuana was concealed (2 R. 86, 90). Mortimer and Andrew thus knew to fill only one of the gas tanks. As truck drivers are generally "fuel conscious" (2 R. 176-77), the jury properly inferred that Mortimer knew to fill only one gas tank because the other gas tank contained the hidden compartment.

Finally, based on Mortimer's own statements to the authorities, he was en route either to Houston or North Carolina when the marijuana was found at the Falfurrias checkpoint. The most direct route to either destination from the Best Western located between Harlingen and La Feria on Highway 83 west was not north

33

on Highway 281 through the Falfurrias checkpoint, but northeast on Highway 77 through the Sarita checkpoint. Mortimer drove to the Silver Spur Truck Stop located off Highway 281 near McAllen ostensibly to obtain a load. However, DeWayne observed his activity all day at the Silver Spur and testified that he did not leave the Silver Spur even after the brokerage office closed at 5:00 p.m. (2 R. 244, 246). The jury thus could infer that Mortimer went to the Silver Spur to await the "go-ahead" page and phone call advising him to leave with the marijuana. The jury could properly conclude that Mortimer traveled to the Falfurrias checkpoint rather than the Sarita checkpoint because that had been his successful route in June 1998 (2 R. 64-66).

The jury thus properly found that Mortimer knew of the concealed marijuana based on: his inconsistent statements; he drove the truck and filled only one gas tank while traveling from North Carolina to South Texas; the presence of the nuts, bolts and washers inside the tractor; his nervousness and interest in the canine search at the checkpoint; the empty trailer both en route to South Texas and on the return trip to North Carolina; Mortimer's false denial that the August 11, 1998, incident was his first trip to South Texas; and his improbable story that an unknown third man had traveled with him from North Carolina to Texas.

The 269 pounds of marijuana seized from the tractor's fuel tank were valued at $215,200 (2 R. 274-75). Mortimer's intent to distribute the marijuana can be

inferred from the drugs' amount and value. *See United States v. Suarez*, 155 F.3d 521, 524 (5th Cir. 1998)("Intent to distribute is typically inferred from the fact that an amount is too large for any purpose other than distribution")(quoting *United States v. Sanchez*, 961 F.2d 1169, 1178 (5th Cir. 1992)); *United States v. Caballero*, 712 F.2d 126, 131 (5th Cir. 1983) (jury may infer intent to distribute from price of drugs). Evidence of Mortimer's 1992 Florida drug conviction also was probative of his intent to commit the drug crimes charged. And, as courts have recognized, drug dealers generally do not suffer the presence of innocent bystanders during a drug transaction. *See United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1374 (11th Cir. 1994); *United States v. Martinez-Moncivais*, 14 F.3d 1030, 1034 (5th Cir. 1994).

The government thus proved by direct and circumstantial evidence that Mortimer conspired with Earl Ashman, the unknown travel companion, the person who built the secret compartment, and others unknown to violate the drug laws. The government further proved that Mortimer, the driver of the tractor trailer rig, possessed the 269 pounds of marijuana with the intent to distribute it. By driving to Texas to pick up the marijuana and transport it to North Carolina, Mortimer shared in the criminal intent to commit the crime and sought by his actions to make the illegal venture succeed.

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 52 of 64

When Mortimer took the witness stand in his own defense he put his credibility in issue. *United States v. Farias-Farias*, 925 F.2d 805, 809 (5th Cir. 1991); *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995). Mortimer's testimony was riddled with inconsistencies. For example, Mortimer reiterated his claim about the unknown traveling companion who allegedly borrowed the tractor trailer rig on the evening of August 10, 1998, embellishing that the man had said he had an emergency and had to leave on a plane (3 R. 326). Mortimer initially could not remember the man's name's but then referred to him as "Johnie" (3 R. 310, 312-14, 326). Mortimer, who claimed to be afflicted with "sleep adnausea", denied driving the truck from North Carolina to South Texas (3 R. 314-15, 320), when the trailer's logbook showed his signature as driver with no co-driver (2 R. 287; GX21). According to Mortimer, Earl Ashman asked him to accompany his driver to South Texas because the driver did not know his directions and was not good with the truck. Mortimer, however, testified he had "sleep adnausea" and had never been to South Texas (3 R. 337-38). Although Mortimer claimed that "Johnie" before leaving had given him $500 on August 11, 1998, Mortimer had $28 in his wallet when arrested (3 R. 350-51). The jury as fact finder was free to disbelieve Mortimer's testimony in whole or in part. *United States v. Garza*, 990 F.2d 171, 175 (5th Cir. 1993)("the jury is the ultimate arbiter of witnesses' credibility and is

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 53 of 64

free to choose among reasonable constructions of evidence"). Mortimer's

convictions should be affirmed as based on sufficient evidence.

# CONCLUSION

For these reasons the judgment of the district court should be affirmed in its

entirety.

Respectfully submitted,

**MERVYN M. MOSBACKER**
United States Attorney

**PAULA C. OFFENHAUSER**
Assistant United States Attorney

ALICE ANN BURNS
Assistant United States Attorney
910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77002
(713) 567-9102

**ATTORNEYS FOR APPELLEE**

38

## CERTIFICATE OF SERVICE

I, Alice Ann Burns, Assistant United States Attorney, certify that a copy of

this brief has been served by placing it in the United States mail, postage prepaid,

on October 8, 1999, addressed to:

Rene Gomez
225 Industrial Drive
Brownsville, Texas 78521

Attorney for appellant Mortimer

ALICE ANN BURNS
Assistant United States Attorney

39

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 56 of 64

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

1. Exclusive of the exempted portions in 5th Cir. R.32.27(b)(3), the brief contains 9103 words in proportionally spaced typeface.

2. The brief has been prepared in proportionally spaced typeface using CG Times 14 point font for text and 12 point for footnotes produced by Corel WordPerfect 8.0 software.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the court's striking the brief and imposing sanctions against the person signing the brief.


**ALICE ANN BURNS**
Assistant United States Attorney

CIMPDF - www.fsviita.com

## United States Court of Appeals

FIFTH CIRCUIT
OFFICE OF THE CLERK

CHARLES R. FULBRUGE III
CLERK

00 JAN -7 PM 2:40

TEL. 504-589-6514
600 CAMP STREET
NEW ORLEANS, LA 70130

January 4, 2000

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW
Regarding:  Fifth Circuit Statement on Petitions for Rehearing or
            Rehearing En Banc

            No. 99-40257 USA v. Mortimer
            USDC No.  B-98-CR-466
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Enclosed is a copy of the court's decision, and judgment has been
entered under FED. R. APP. P. 36.  (However, the opinion may yet contai
typographical or printing errors which are subject to correction.)

FED. R. APP. P.'s 39 through 41, and 5TH CIR. RULES 35, 39, and 41 govern
costs, rehearings, and mandates.  New 5TH CIR. RULES 35.2.10 and 40
require that a copy of the opinion or order sought to be reviewed
shall be bound with the petition for rehearing or suggestion for
rehearing en banc as an appendix but shall not be marked or
annotated.  Please read carefully the Internal Operating Procedures
(IOP's) following FED. R. APP. P. 40 and 5TH CIR. R. 35 for a discussion
when a rehearing may be appropriate, the legal standards applied and
sanctions which may be imposed if a nonmeritorious suggestion for
en banc is made.

<u>Direct Criminal Appeals</u>.  5TH CIR. R. 41 provides that a motion for a
stay of mandate under FED. R. APP. P. 41 shall not be granted simply
upon request.  The petition must set forth good cause for a stay or
clearly demonstrate a substantial question is to be presented to the
Supreme Court.  Otherwise, the motion may be denied and the mandate
issued immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court and/o
on appeal, and will be considering filing a petition for <u>certiorari</u>
in the United States Supreme Court, you do not need to file a motic
for stay of mandate under FED. R. APP. P. 41.  The issuance of the
mandate does not affect the time, or your right, to file such a
petition.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: _Joseph Armato_
    Joseph Armato, Deputy Clerk

Enclosure
Ms Paula Camille Offenhauser
Ms Alice Ann Burns
Mr Rene Gomez

*Appendix B*

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 57 of 64

06/25/2001 15:39 FAX 7137183302          US ATTY APPEALS                                  ☑023
01/04/01  THU 16:02 FAX 7137183389        US ATTORNEY-OPS

U.S. COURT OF A
FILE

JAN 0 4 20

CHARLES R. FULB

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 99-40257
Summary Calendar

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN EDWARD MORTIMER,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. B-98-CR-466-1

---

Before GARWOOD, BARKSDALE and DENNIS, Circuit Judges.

PER CURIAM:*

John Edward Mortimer (Mortimer) was convicted by a jury of
possession of marihuana with intent to distribute, as well as
conspiracy to possess with intent to distribute, in violation of 21
U.S.C. §§ 841(a)(1) and 846. He was sentenced to concurrent terms
of 80 years, followed by four years supervised release, and no

---

* Pursuant to 5TH CIR. R. 47.5 the Court has determined that this
opinion should not be published and is not precedent except under
the limited circumstances set forth in 5TH CIR. R. 47.5.4.

fine, on each count. Mortimer now appeals his convictions, arguing that he is entitled to a judgment of acquittal, or alternatively, that there was insufficient evidence to support a conviction on either count. We affirm.

This prosecution resulted from an August, 1998, search at the Border Patrol checkpoint near Falfurrias, Texas. Border Patrol agents found approximately 269 pounds of marihuana in a concealed compartment in one of the large fuel tanks of the tractor-trailer rig which Mortimer was driving. The tank had been elaborately modified to store narcotics and signs of welding were visible on the exterior. The marihuana was valued at $215,200.00. Mortimer was accompanied by Andrew Smith, who was not prosecuted, possibly due to insufficient evidence.

Mortimer first contends that the district court erred by denying his Fed. R. Crim. P. 29 motion for a judgment of acquittal. Although Mortimer moved for a judgment of acquittal after the Government rested its case, he failed to renew the motion after he presented his case and the evidence was closed. He also did not renew his motion after the jury returned its verdict, as authorized by Rule 29(c). "Where a defendant fails to renew his [Rule 29] motion at the close of all the evidence, after defense evidence has been presented, he waives his objection to the earlier denial of his motion." *United States v. Daniel*, 957 F.2d 162, 164 (5th Cir. 1992). Accordingly, Mortimer has waived his right to complain of

2

the denial of his Rule 29 motion.

Mortimer's second major argument is that the evidence presented to the jury was insufficient to establish his guilt beyond a reasonable doubt on either count.    Regarding the possession count, he asserts that the evidence was insufficient to prove that he knew there was marihuana concealed in the fuel tank. Mortimer's "failure to argue the correct standard of review on appeal does not . . . prevent [this Court] from measuring the argument against the appropriate standard of review."    *United States v. Pierre*, 958 F.2d 1304, 1311 n.1 (5th Cir. 1992) (en bank).

Because Mortimer failed to renew his Rule 29 motion, this Court reviews the sufficiency-of-evidence issue under the plain-error standard.    *United States v. Parker*, 133 F.3d 322, 328 (5th Cir.), *cert. denied*, 118 S.Ct. 1851 (1988).    "A conviction may be reversed under [this] standard only to avoid a manifest miscarriage of justice."    *Id.*    "Such a miscarriage would exist only if the record is 'devoid of evidence pointing to guilt,' or . . . 'because the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'"    *Pierre*, 958 F.2d at 1310 (citations and quotation marks omitted).

"A conviction for the offense of possession of marijuana with intent to distribute requires proof that the defendant (1) knowingly (2) possessed marijuana (3) with intent to distribute

3

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 61 of 64

it."  *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996).

"In the nature of things, proof that possession of contraband is knowing, will usually depend on inference and circumstantial evidence."  *United States v. Richardson*, 848 F.2d 509, 514 (5th Cir. 1988).    Furthermore, "*knowledge* of the presence of the contraband may ordinarily be inferred from the exercise of control over the vehicle in which it is concealed."  *Id.* at 513.  When drugs are hidden in a vehicle, however, such knowledge usually can be inferred only "if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge."  *United States v. Garza*, 990 F.2d 171, 174 (5th Cir. 1993), (quoting *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990)).

Trial evidence that supports the jury's finding that Mortimer knowingly possessed the marihuana includes his nervousness at the checkpoint; his inconsistent statements to agents at the checkpoint, which also differed from some of his trial testimony; the evidence that he filled only one fuel tank while driving the rig from North Carolina to Texas, which required him to refuel twice as often as he would have had he filled both tanks at once; the fact that his trailer was always empty when Mortimer had the rig in southern Texas; the visible welding of the fuel tank to accomodate its use as a secret compartment; Mortimer having had possession of the truck since at least June 1998 and having driven

4

it great distances since then; and Mortimer's untruthful testimony
that he had not traveled to southern Texas in June, 1998.  Also
probative is Mortimer's improbable attempt to place the blame on a
third person purportedly known to him only as "Johnie." *See United
States v. Ortega-Reyna*, 148 F.3d 540, 544 (5th Cir. 1998) (listing
circumstantial evidence that this Court has recognized as
suggestive of guilty knowledge of the presence of drugs, including
nervousness, obvious or remarkable alterations to the vehicle,
inconsistent statements, and implausible explanations).  From the
marihuana's large quantity and value, the jury could infer that
Mortimer knowingly intended to distribute it.  *See United States v.
Suarez*, 155 F.3d 521, 524 (5th Cir. 1998).

     Mortimer also contests the sufficiency of the evidence
supporting his conspiracy conviction.  Specifically, he argues that
the government failed to prove that he knew of or participated in
the alleged drug conspiracy, or that such a conspiracy existed.
"To establish a drug conspiracy under 21 U.S.C. § 846, the
government must prove beyond a reasonable doubt (1) an agreement
between two or more persons to violate the narcotics laws, (2) that
each alleged conspirator knew of the conspiracy and intended to
join it, and (3) that each alleged conspirator did participate
voluntarily in the conspiracy."  *United States v. Inocencio*, 40
F.3d 716, 725 (5th Cir. 1994).  A jury may infer any element of
this offense from circumstantial evidence.  *United States v.*

5

Case 1:00-cv-00171   Document 17   Filed in TXSD on 06/25/2001   Page 63 of 64

*Lechuga,* 888 F.2d 1472, 1476 (5th Cir. 1989). Moreover, a jury "may find knowledgeable, voluntary participation from presence [at the scene of criminal activity] when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." *United States v. Paul*, 142 F.3d 836, 840 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 271 (1998), 119 S.Ct. 2379 (1999).

An examination of the record reveals ample evidence to support Mortimer's conspiracy conviction, and is more than adequate to show that he was not acting alone. Mortimer testified that the owner of the rig recruited him to make the August trip to Texas with Johnie, who allegedly drove the rig and was entrusted with the expense money for the trip. The owner of the truck also coordinated the repairs to the rig, and the jury was entitled to infer that it would have been virtually impossible for the owner not to have known about the secret compartment. In addition, a government witness testified that he had seen Mortimer driving the same rig in south Texas in June, 1998. Also, there was evidence that creation of the hidden compartment was likely the work of more than one person. Therefore, Mortimer's knowing possession of the marihuana, as well as his own testimony and other inculpatory evidence, clearly supports the jury's finding that he conspired with one or more others to possess the marihuana with the intent to distribute it. "[A] jury may choose to believe part of what a witness says

without believing all of that witness's testimony." *United States*

*v. Merida,* 765 F.2d 1205, 1220 (5th Cir. 1985).

In light of the trial evidence, the affirmance of Mortimer's

convictions does not constitute a miscarriage of justice (and,

indeed, appears amply sufficient under any standard).  *See Parker,*

133 F.3d at 328.

AFFIRMED.